### VIRGINIA-CAROLINA CHEMICAL CO. v. EHRICH et al.

(District Court, E. D. South Carolina. March 2, 1916.)

No. 80.

1. ASSIGNMENTS ⬡⟹22—AGREEMENTS TO ASSIGN—NECESSITY OF REGISTRATION.

A corporation made a contract with a manufacturer of fertilizers under which fertilizers furnished were to remain the property of the manufacturer until sold or settled for, and when sold all proceeds of sales, including cash, notes, open accounts, and liens, were to be kept for the use and benefit of the manufacturer and surrendered to it. Held that, even though the contract was within the registration laws of the state and invalid as against creditors or a trustee in bankruptcy when not registered, there was nothing to prevent a delivery of the accounts to the manufacturer at a time when creditors had acquired no lien thereon.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 35–39; Dec. Dig. ⬡⟹22.]

2. CORPORATIONS ⬡⟹351—DIRECTORS—LIABILITY FOR NEGLIGENCE—REMEDY.

A suit to charge the officers and directors of a corporation with personal liability for the misappropriation by the corporation of money held by it as agent or trustee for plaintiff, on the theory that they owed plaintiff the duty to so direct and supervise the business of the corporation

as to prevent the misappropriation, was properly brought in equity, upon the theory that the directors are quasi trustees.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1492, 1493; Dec. Dig. ⊜351.]

3. CORPORATIONS ⊜341—DIRECTORS—LIABILITY FOR NEGLIGENCE.

While there is no privity of contract between directors and creditors of a corporation, and while the duty of supervision of the managing officers and employés, and the exercise of reasonable care to protect its assets, is primarily due to the corporation, a creditor or person dealing with the corporation, reasonably relying upon the discharge of such duty by the directors, and showing injury by reason of their failure to discharge such duty, has a remedy against them personally.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1479–1484; Dec. Dig. ⊜341.]

4. CORPORATIONS ⊜333—DIRECTORS—LIABILITY FOR NEGLIGENCE.

A corporation contracted with a manufacturer under which fertilizers were furnished for sale, all proceeds of sales to be held subject to the manufacturer's order. Accounts and obligations for fertilizers sold were turned over to the manufacturer and redelivered to the corporation for collection, and they were collected and misappropriated. The contract and the corporation's receipt for the obligations were signed by the secretary and treasurer, who was also manager of the corporation's business. It was customary for the president to countersign contracts and checks, and it did not appear that the directors other than the officers knew the custom was not observed in the particular transaction. The directors were not negligent in electing the officers mentioned who were apparently competent and trustworthy. It did not appear that any meeting of the directors was held, or was due to be held under the by-laws, between the date when the accounts, etc., were received by the corporation and the dates when they were collected and misappropriated, or that the directors other than such officers knew of the receipt thereof, or of the collection and misappropriation. *Held*, that the directors other than the officers were not personally liable for the misappropriation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1451; Dec. Dig. ⊜333.]

5. CORPORATIONS ⊜333—DIRECTORS—LIABILITY FOR NEGLIGENCE.

That directors of a corporation received no compensation for their services cannot exonerate them of the liability which the law attaches for a breach of their duty to direct and supervise the business of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1451; Dec. Dig. ⊜333.]

6. CORPORATIONS ⊜333—DIRECTORS—LIABILITY FOR NEGLIGENCE.

That directors of a mercantile corporation which misappropriated funds held by it as agent or trustee for plaintiff were also directors of other corporations which received the benefit and use of the funds so misappropriated did not make them personally liable for the misappropriation, in the absence of knowledge on their part of the transaction.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1451; Dec. Dig. ⊜333.]

7. CORPORATIONS ⊜333—DIRECTORS—LIABILITY FOR NEGLIGENCE.

The high character and standing in the business life of the community of directors in a corporation imposed no higher degree of care upon them in the discharge of their duties as directors, though the credit of the corporation was thereby enhanced.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1451; Dec. Dig. ⊜333.]

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. CORPORATIONS ☞361—DIRECTORS—ACTIONS FOR BREACH OF DUTY—BURDEN OF PROOF.

In a suit to charge directors and officers of a corporation with personal liability for the misappropriation by the corporation of funds collected and held by it as agent or trustee for plaintiff, defendants, who knew of or participated in the misappropriations, had the burden of showing that a part of the amounts collected belonged to the corporation and not to plaintiff, since a trustee or agent mingling his own property with that of his principal has the burden of either making the separation or giving the court the information necessary to enable it to do so.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1506; Dec. Dig. ☞361.]

In Equity. Bill by the Virginia-Carolina Chemical Company against L. S. Ehrich and others, seeking to charge defendants, managing officers and directors of the Rosemary Mercantile Company, Incorporated, with personal liability for misapplication by the corporation of funds held as agent or trustee of plaintiff. Decree for plaintiff against certain defendants, and bill dismissed as to the other defendants.

Mitchell & Smith, of Charleston, S. C., for plaintiff.
Kelley & Hinds, of Kingstree, S. C., for defendants.

CONNOR, District Judge. The plaintiff, which will be referred to as the "Chemical Company," is a New Jersey corporation engaged in the manufacture and sale of commercial fertilizers. During the year 1910, and prior thereto, it maintained an agency in the state of South Carolina, for the purpose of making contracts for the sale of its manufactured products. The Rosemary Mercantile Company, which will be referred to as the "Mercantile Company," was a corporation created and organized under and pursuant to the laws of South Carolina, with power to conduct a general mercantile business, buying and selling goods and merchandize, including commercial fertilizers. Defendants, other than W. D. Morgan and A. C. Hinds, at the time of and prior to the transaction with plaintiff, were directors of the company. L. S. Ehrich was the president, and B. A. Brown secretary and treasurer.

On February 4, 1910, the Chemical Company entered into a contract in writing, signed by its duly authorized agent, with the Mercantile Company, signed "Rosemary Mercantile Company, by B. A. Brown." The Chemical Company agreed to deliver to the Mercantile Company, at Georgetown, S. C., commercial fertilizers; a schedule of quantity, analysis, and price per ton, being incorporated in the body of the contract.

Among other things, it was provided that, until sold, or settled for, the fertilizers contracted for and delivered should remain the property of the Chemical Company, and, when sold, all proceeds of sales of such fertilizers, including cash, notes, open accounts and liens, and all collections therefrom, should be kept separate and held for the use and benefit of the Chemical Company, and subject to its order. The Mercantile Company agreed to send, on or before May 1, 1910, to the Chemical Company a complete list of time sales, and indorse, if neces-

sary, and surrender to the Chemical Company, all notes, liens, bills of sale, or any other evidence of debt received by the Mercantile Company from purchasers of fertilizers, which were to be returned by the Chemical Company to the Mercantile Company, for, the purpose, only, of collection and remittance to the Chemical Company, and when so returned to be receipted for in trust for the Chemical Company. In pursuance of the provisions of the contract, the fertilizers were delivered to the Mercantile Company, a portion of which were sold to its customers, on credit.

On the 29th of August, 1910, the Chemical Company delivered to the Mercantile Company a number of notes, accounts, and chattel mortgages, amounting to $7,717.00, which represented sales on credit of fertilizers delivered to the Mercantile Company under the terms of the contract of February 4, 1910. These notes and accounts had been theretofore delivered to the Chemical Company. The Mercantile Company, "by B. A. Brown," executed a receipt for the notes, to which a schedule was attached, showing names of debtors, securities, and amounts. By the terms of the receipt, the Mercantile Company agreed "to hold same in trust for collection for the account of said company and will hold all collections of same as they are made for the use and benefit of said company and subject to its order as per terms of our contract, dated February 4, 1910." The Mercantile Company collected from, and on account of, the notes, etc., so received by it, the sum of $5,188.80. Of the amount so collected, the Mercantile Company paid to the Chemical Company the sum of $826.89. The uncollected notes, etc., held by the Mercantile Company, when it was adjudged bankrupt, were delivered, by Mr. Ehrich, president, to the Chemical Company. The Chemical Company collected from the accounts so delivered to it $85.50, leaving due the Chemical Company, on account of the collections, $4,276.41. The Mercantile Company became insolvent, and was adjudged bankrupt, March 11, 1911.

The master finds:

"That the president, L. S. Ehrich, and the treasurer, B. A. Brown, had actual knowledge of all transactions set forth in the bill of complaint, but that the other directors, defendants herein, did not have any actual knowledge of the contract and the collections made thereunder, other than such knowledge as they might have, generally, of the method of dealing on the part of the Rosemary Mercantile Company in the purchase of fertilizers."

He further found that defendant J. B. Steele is one of the most prominent men in the financial circles of Georgetown, a director of numerous corporations, and a man of high standing in the community, president of the People's Bank and of the Georgetown Grocery Company. The Mercantile Company had been in existence six or seven years. Defendant lived in Georgetown, about 16 miles from Rosemary, where the company carried on business. He had no knowledge of the transaction with the Chemical Company or the receipt of the notes, etc., nor of collections made therefrom.

Defendant W. H. Andrews had been, for many years, of the most prominent men of the county; identified with large interests and probably known to more people than any one else in that section; lived

in Georgetown. He attended the annual meetings of the directors. Knew nothing about the transaction with the Chemical Company. Knew nothing of the receipt of the securities or the collection of the money.

Defendant R. M. Barnes was a director during the year 1910. It does not very clearly appear when he was elected. Attended two meetings, "not more than three," in Georgetown. Knew nothing of the transaction with the Chemical Company until he was served with process in this case. Was not at all familiar with the management of the corporation. Manager of the Atlantic Coast Lumber Corporation; owned $1,000 stock in the Mercantile Company; paid money for it. "Simply bought the stock and paid no attention to the business. I had nothing to do with the management of it. Don't remember much about it."

Neither of the directors received a salary. On the 14th of May, 1910, the Mercantile Company executed a mortgage conveying to the Georgetown Grocery Company its real estate for the purpose of securing the payment of an indebtedness of $3,000 and an advancement of $2,500. L. S. Ehrich was elected president in 1908, succeeding Mr. McCleary, deceased. B. A. Brown was employed as manager. He was also secretary and treasurer. The business was conducted by him under the management and direction of the president. Mr. Ehrich says:

"The understanding was absolutely that no paper was valid unless signed by the secretary and countersigned by the president."

This testimony was objected to by counsel for plaintiff "unless it was shown by the formal act of the board of directors to be his duty as secretary."

Mr. Ehrich testified that he instructed Brown not to sign a contract with the Chemical Company; that he objected to his doing so. Ehrich was also a director and manager of the Georgetown Grocery Company, and that the Mercantile Company was largely indebted to the Grocery Company; that during the year 1910 the Grocery Company sold goods to the Mercantile Company on credit to a large amount. Mr. Ehrich says that some two months after he told Brown not to sign a contract, when Tucker, the agent of the Chemical Company, was in Georgetown and talked with him about the Georgetown Grocery Company, and then about the Rosemary Mercantile Company having turned over to him the securities; that he immediately took the matter up with Brown; he said that he had done it. Referring to a conversation had with Tucker, before the contract was signed, Mr. Ehrich says that he remembered on one occasion that Tucker asked him about making a contract with the Georgetown Grocery Company and about a contract with the Rosemary Mercantile Company.

"I told him that I didn't know what they wanted that year and that he had better see Brown. I don't recollect any other interview with Tucker."

Tucker says that during the month of February (1910) he saw Ehrich about selling the Georgetown Grocery Company, of which he

was manager, and at the same time suggested that it would save him a trip to Rosemary if he would buy for the Rosemary Company. Ehrich said that he (Tucker) had best go to Rosemary and interview Brown, who knew just exactly what they wanted; that he did not. As the result of that visit, he made the contract. Ehrich did not sign it. While considerable evidence was introduced in regard to the manner of dealing, it is manifest that Ehrich knew before any of the money from the accounts delivered to the Mercantile Company for collection was collected, that Brown had executed the contract, sold the fertilizer, and received the notes and accounts for collection and used by Brown for the benefit of the Mercantile Company; the collections were deposited in the People's Bank of Georgetown to the credit of the Mercantile Company and drawn out upon its checks.

The case, as presented by the findings of the master, which is sustained by the evidence, comes to this:

The Mercantile Company, in the course of its regular business and within the powers conferred by its charter, through its manager, entered into a contract February 4, 1910, with the Chemical Company, for the purchase of commercial fertilizers during the season of that year. By the terms of the contract the fertilizers delivered, until sold, and the proceeds, whether cash or accounts, notes, etc., and the securities taken therefor, were and remained the property of the Chemical Company. At the end of the season, the accounts, notes, chattel mortgages, and other securities held by the Mercantile Company were delivered to the Chemical Company. In pursuance of the terms of the contract, the Chemical Company delivered these accounts, notes, etc., to the Mercantile Company; B. A. Brown signing the receipt therefor. He collected from these claims the sum found by the master and deposited such collections to the credit of the Mercantile Company in the People's Bank of Georgetown, and, except the sum paid to the Chemical Company, found by the master, checked the amounts out for the benefit of the Mercantile Company. Neither of the defendants J. B. Steele, W. H. Andrews, nor R. M. Barnes, had any knowledge of the contract, the receipt of the notes, etc., and the collections made thereon.

[1] Passing, for the present, the question as to the authority of B. A. Brown, secretary and treasurer, who was also manager of the business of the Mercantile Company, to execute the contract of February 4, 1910, or to receive the accounts, notes, etc., from which the collections were made upon the terms set out in the receipt, and bind the corporation, it will be well to dispose of the pivotal questions debated by counsel. The contract of February 4, 1910, was in the usual form and contained the provisions usually found in contracts used by fertilizer companies, dealing with merchants to whom they sold fertilizers to be resold to their customers for cash and on credit. The Supreme Court of South Carolina, in Bank v. Greenville, 97 S. C. 299, 81 S. E. 634, holds that the contract, so far as the registration laws of the state are concerned, does not constitute a mortgage on the accounts, notes, etc.; whereas, the Circuit Court of Appeals of this Circuit, in Townsend v. Ashpoo Fertilizer Company, 212 Fed. 97, 128 C. C. A. 613, holds that the contract constitutes a mortgage

and is, as against creditors or a trustee in bankruptcy, invalid without registration. The question as to the effect to be given by the federal court to the decision of the state court is considered by Judge Smith in Re Floyd and Hayes (D. C.) 225 Fed. 262, in which he followed the decision of the state court. The judgment was affirmed by the Circuit Court of Appeals. In Townsend v. Ashpoo Fertilizer Company, supra, the accounts held by Roof, the customer, had not been delivered to the Fertilizer Company, at the date of his adjudication. It would seem, without regard to the question whether, as held in that case, the original contract was within the registration laws, and therefore invalid as against the trustee in bankruptcy, that, when in pursuance of the terms of the contract, before the adjudication in bankruptcy of the customer, the accounts had been delivered to the Chemical Company, the relation of mortgagor and mortgagee, if it ever existed, ceased, and the Chemical Company held them as its own property.

It does not appear to be very material, except as explaining the transaction, whether Brown was authorized to sign the contract of February 4, 1910, because the obligations of that contract were, so far as these accounts are concerned, executed—discharged. The Mercantile Company ceased to have any duty, or obligation, to the Chemical Company, with respect to the accounts, until delivered. The Chemical Company had, by receiving them, assumed the duty of collection and application of the proceeds to the discharge of the notes which it held against the Mercantile Company for the price of the fertilizer. At the time they were delivered to the Chemical Company, no creditors had acquired any lien upon them. Hence, there was no reason why they should not have been delivered according to the terms of the contract. It was valid as between the parties, without registration. Whatever liability, therefore, was imposed upon the Mercantile Company, must be found in the receipt of them, on August 29, 1910. It is to the breach of duty assumed by Brown for the Mercantile Company, at that time, that the Chemical Company must resort to fix liability upon the Mercantile Company. It is true that, by the terms of the contract, the Mercantile Company agreed to "surrender" to the Chemical Company the notes, etc., "which are to be returned" by the company "for the purpose only of collection and remittance, * * * and when so returned are to be receipted for in trust to the company." These several stipulations were complied with. It is doubtful whether, disassociated from the contract of February 4, 1910, the receipt by Brown, as secretary and manager of the Mercantile Company of the notes and accounts, was within the scope of his power, and imposed upon the corporation any liability, unless it received the amount collected from them. If he had appropriated the proceeds to his own use, it is not clear that the Mercantile Company would have been liable. As he deposited the proceeds to the credit of the Mercantile Company, they could have been reached, while so held, or, if used, the Mercantile Company would have been liable to an action for money had and received or, in equity, for an accounting.

[2] The basis upon which the Chemical Company seeks relief, in this suit in equity, is that the Mercantile Company received the money in trust, and that its failure to pay it over constituted a breach of such trust, and that the defendants, by their negligence, have become personally liable therefor. This contention is based upon the theory that the defendants, by reason of being directors, at the time the notes and accounts were received and collected, and the proceeds misapplied, owed the duty to the Chemical Company to so direct and supervise the business of the corporation that the breach of trust would have been prevented, and the specific money, as collected, been paid over to the Chemical Company. In this respect, the suit is of first impression. Numerous cases are found in which directors of corporations have been held personally liable, either for making representations regarding the value of corporate property, or the financial condition of the corporation, whereby parties have been induced to purchase stock, or loan money, or otherwise extend credit to the corporation. The remedy for wrongs of this character is usually sought by an action for deceit, wherein the loss sustained constitutes the measure of damages. In other cases personal liability is fixed by reason of the negligent failure of directors to give to the business of the corporation that degree of care which is, by law, imposed upon them, resulting either in the loss of the assets by bad management, or the default of managing officers. The liability, in this class of defaults, is measured by the extent of the loss sustained by the corporation, whose agents they are. Liability incurred for breach of duty, in respect to the exercise of due care in the discharge of their duty, may be imposed either in an action at law for damages, or suit in equity, upon the theory that the directors are quasi trustees. Emerson v. Gaither, 103 Md. 364, 64 Atl. 26, 8 L. R. A. (N. S.) 738, 7 Ann. Cas. 1114 notes.

This suit is properly brought in equity. Assuming that a liability to execute the trust was imposed by the receipt of the notes and accounts, upon the corporation, and that the Chemical Company would be entitled to a decree against it, directing the payment of the amount collected and not paid over for a breach of trust, the question presented is whether, upon the facts found by the master, the defendants, directors, are personally liable therefor. The foundation of the alleged liability sought to be imposed upon the directors is analogous to that stated by Mr. Chief Justice Fuller in Briggs v. Spaulding, 141 U. S. 132, 145, 11 Sup. Ct. 924, 928 [35 L. Ed. 662], wherein he says:

"It is not contended that the defendants knowingly violated, or permitted the violation of, any of the provisions of the Banking Act, or that they were guilty of any dishonesty in administering the affairs of the bank; but it is charged that they did not diligently perform duties devolved upon them by the act."

That was a suit in equity by the receiver of an insolvent national bank against the directors, in which it was sought to fix them with personal liability, for negligently failing to discharge their duties, resulting in violations, by the cashier, of the provisions of the act and wasting of the assets of the bank. The court discusses their liability,

both as to the violations of the provisions of the statute by the managing officers, and failing to perform their duties independent of the statute.

[3] It is well settled that, while there is no privity of contract between the directors and the creditors of a corporation, and that the duty of supervision of the managing officers and employés, and the exercise of reasonable care to protect its assets, is primarily due to the corporation, a creditor or person dealing with the corporation, reasonably relying upon the discharge of such duty by the directors, and showing injury by reason of their failure to do, has a remedial right against them personally. For torts, deceits, misrepresentations, etc., resulting in damage, the foundation of the liability to the person injured is clear. The same is true when the corporation commits a tort and the officer or director has actual knowledge of and participates in it. When, however, it is sought to fix personal liability for negligence, and extend such liability to corporate acts of which the director has no personal knowledge, or in which he takes no active part, the courts find difficulty in finding the basis, and fixing the extent, of the liability. In Briggs v. Spaulding, supra, defining the duties of directors of banks, in respect to the degree of care which should be imposed, the Chief Justice says:

"Bank directors are often styled trustees, but not in any technical sense. The relation between them and the corporation is rather that of principal and agent, certainly so far as creditors are concerned, between whom and the corporation the relation is that of contract and not of trust. But, undoubtedly, under circumstances, they may be treated as occupying the position of trustees to cestui que trust."

In a recent work, in which the decided cases are reviewed, it is said:

"In discussing, and determining, the liability of officers and other agents of corporations, for negligence, the judges have employed language which is often irreconcilable and formulated rules which, however well understood in the abstract, have been difficult of application, and have led to conflicting judgments upon facts substantially identical." 7 Ruling Case Law, 491.

The increase in the number and variety, in respect to the character of business in which they engage, of private corporations, have imposed upon the courts the duty of finding a legal basis for fixing the relationship between the corporation, stockholders, and creditors, and its directors. That the court was impressed with the necessity of careful consideration, and the use of well-considered language in Briggs v. Spaulding, supra, is manifest from a careful examination of the opinion written by the Chief Justice. Corporations conduct their operations only through the medium of agents, and these agents must be selected either by the stockholders, directors, or the president, or other managing officers. In the selection of these officers or agents, as in all other matters, the board of directors must act jointly, and as a board; hence it is difficult to fix personal, individual, responsibility for mistakes of judgments, or negligence. After an examination of, and making quotations from, the best considered decisions, the Chief Justice reaches the conclusion that:

"The degree of care to which these defendants were bound is that which ordinarily prudent and diligent men would exercise under similar circum-

stances, and in determining that the restrictions of the statute and usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is therefore ultimately a question of fact, to be determined under all the circumstances."

[4] There is nothing in the evidence indicating negligence, in the election of Mr. Ehrich, as president, and Mr. Brown as secretary and treasurer, and manager of the business, or in the extent of the power conferred upon them. Mr. Ehrich was the manager of the Georgetown Grocery Company and, so far as appears, was competent and trustworthy. The same is true of Brown. It appears from his evidence, and from checks introduced, that it was customary for the president to countersign contracts and checks, although he did not sign the contract, or the notes, given to the Chemical Company. This is not material on the question of the liability of the corporation, but is relevant in regard to the manner in which the business was conducted, so far as the personal liability of the directors is concerned. There is no evidence that the directors knew that this custom was not observed in this transaction. The alleged negligence comes to this: The failure of the directors to know that the contract was made, that the notes and accounts were delivered and collected, and the proceeds were not paid over. Unfortunately, the book containing the record of the meetings of the board of directors has been lost. I concur with the master that the loss is not very satisfactorily explained, but there is no suggestion that it was ever in the keeping or custody of the defendants Steele, Andrews, or Barnes. It appears that they held annual meetings. If they did not hold regular meetings so frequently as they should, this cannot be imputed as actionable negligence on the part of individual directors. If the receiver, or other representative of the corporation, was suing for neglect to give that degree of attention to the business which the law required, and it appeared that, by reason of the course which, upon their own statements, the defendants pursued, the assets were wasted or misappropriated, I am of the opinion that he would be entitled to a decree, the amount of which would depend upon the extent to which the corporation sustained loss, by reason of such breach of duty. That, however, is not the case with which we are dealing. The charge is that a specific sum derived from a specific transaction was misappropriated by the managing officer of the corporation, and that he was enabled to do so by reason of the negligence of the defendants. The alleged negligence consists either in their failing to hold meetings of the board of directors, or to make proper examination at the annual meeting, or in failing to examine the books of the corporation between August 29, 1910, when the notes and accounts were received, and the dates upon which they were collected and misappropriated. This date is not fixed, but it must have been during the fall of the year 1910. It does not appear that, during these dates, any meeting of the directors was due to be held under the by-laws, or that any meeting was in fact held. Referring again to the opinion in Briggs v. Spaulding, supra, dealing with a question somewhat analogous, it is said:

"The business of the bank had been conducted for years by the president, assisted by the other executive officers, and it had seemingly been well conducted. * * * Nor was there any violation of law in permitting him to conduct its business, for he was duly authorized to do so under the provisions of the act. We do not mean that this dispensed with reasonable oversight by the directors, but that belongs to a different branch of the enquiry."

To the suggestion that the defendants should have insisted on meetings of the board of directors, or had special meetings called, or otherwise made personal inspection of the affairs of the bank, and, if they had done so, they would have discovered the condition of the bank and prevented losses occurring subsequently, it is said:

"Here, again, it should be observed that even trustees are not liable for the wrongful acts of their cotrustees, unless they connive at them, or are guilty of negligence conducive to their commission."

In that case, there were large transactions in gross violations of express prohibitions of the Banking Act, which it was conceded would have been disclosed by a thorough examination of the books. As to these defaults, it was said that:

"It could not be laid down as a rule that there is an unavoidable presumption of rascality of one's agents in business transactions, and that the degree of watchfulness must be proportioned to that presumption."

The language used by the Vice Chancellor in Scott v. DePeyster, 1 Edw. Ch. 513, and in Wakeman v. Dalley, 51 N. Y. 27, 10 Am. Rep. 551, is quoted with approval. From the opinion in Hallmark's Case, 9 Ch. D. 329, the following language is quoted:

"It is contended that Hallmark, being a director, must be taken to have known the contents of all the books and documents of the company, and so to have known that his name was on the register of shares for 50 shares. But he swears that in fact he did not know that any shares had been allotted to him. Is knowledge to be imputed to him under any rule of law? As a matter of fact, no one can suppose that a director of a company knows everything which is entered on the books, and I see no reason why knowledge should be imputed to him which he does not possess in fact."

The Chief Justice says:

"We are of the opinion that these defendants should not be subjected to liability upon the ground of want of ordinary care, because they did not compel the board of directors to make such an investigation and did not themselves individually conduct an examination during their short period of service, or because they did not happen to go among the clerks and look through the books, or call for and run over the bills receivable."

This, and many of the other cases, found in the reports, involved the duty of directors of banks. Marshall v. Farmers' & Mechanics' Savings Bank, 85 Va. 676, 8 S. E. 586, 2 L. R. A. 534, 17 Am. St. Rep. 84. See, also, 7 Ruling Case Law, § 454, and cases cited.

No higher degree of care should be imposed upon directors of mercantile corporations. The right of the Chemical Company to hold the directors to personal liability in this case is dependent upon showing negligence in respect to the specific transaction, and that such negligence was the proximate cause of the wrongful conduct of the secretary and treasurer.

[5] I concur with the standing master that the fact that the direc-

tors received no compensation for their services cannot be pleaded in exoneration of the liability which the law attaches for a breach of duty. While I also concur in his opinion that attending one or two annual meetings and passing upon matters which might be brought before them does not measure up to the standard of care which the law imposed upon them, I am unable to follow his conclusion that this conduct or failure to discharge their duty in this respect affected or resulted in the loss sustained by the Chemical Company. If it be conceded that knowledge of the existence of the contract of February 4, 1910, should be imputed to them, although, as the master correctly finds, in fact, they did not know of its execution, it does not follow that between August 29, 1910, and the time the money was collected and misapplied, there was any duty imposed upon them fixing them with implied or constructive notice that the accounts, notes, etc., had been delivered to Brown, that he was collecting and misapplying the money.

[6, 7] To the suggestion that corporations of which defendants were directors and stockholders received the benefit and use of the trust funds, and they thereby reaped the benefit of them, it would seem that while such corporations would be liable to account for such amounts as they received from notes and accounts belonging to the Chemical Company, in the absence of knowledge that they were doing so, no personal liability would attach to defendants. If they had knowledge that the misappropriation was being made by Brown, they would be personally liable without regard to their relations to other corporations. While very naturally the high character and standing in the business life of the community of the defendants enhanced the credit of the Mercantile Company, the degree of care in the discharge of their duties imposed upon them was no higher for that reason. If the question of their knowledge of the manner in which the business, in respect to this transaction, was being conducted, was in debate, their intelligence, business capacity, and experience would be relevant; but when, as here, the facts are undisputed, the rule of law is not changed by considerations of this character. As private corporations, conducting all manner of business, increase, and the extent of their transactions with persons other than stockholders enlarges, the courts will find a basis for legal liability of directors, to persons dealing with them, which, while not imposing unreasonable burdens or hardships on directors, will fix with more certainty the degree of care which they will be required to exercise, and the extent of their liability to persons who sustain damage by a failure to meet and discharge the obligation. Many of the elements entering into the consideration of the subject are not found in this case.

[8] Without dealing with all of the exceptions filed by the defendants, other than L. S. Ehrich and B. A. Brown, I am constrained to direct that the bill be dismissed as to defendants W. H. Andrews, J. B. Steele, and R. M. Barnes. I concur in the conclusions of the standing master as to L. S. Ehrich and B. A. Brown. It is suggested that a part of the amounts collected from the notes and accounts were due the Mercantile Company for goods and supplies other than the

fertilizers, and that quoad such amounts there was no misappropriation. If this be true, the burden was on the defendants Ehrich and Brown to show the extent of such amounts, so that the master could separate them from those due for fertilizers; it was their duty to keep the amounts collected for fertilizers separate; the receipt states that the amount of the accounts was due for fertilizers. It is well settled, both upon reason and authority, that, when a trustee or agent mingles his own property with that of his principal, the burden is upon him to either make the separation or give to the court the information necessary to enable it to do so. The conclusion to which I have arrived renders it unnecessary to pass upon many of the exceptions to the report of the master, in regard to the admissibility of evidence entries on the books, etc.

A decree will be drawn dismissing the bill as to all of the defendants except L. S. Ehrich and B. A. Brown. The exceptions as to them are overruled; a decree will be signed, as to them, in accordance with the conclusions of the master.