[L.A. No. 31873. Sept. 4, 1986.]

FRANCES T., Plaintiff and Appellant, v.
VILLAGE GREEN OWNERS ASSOCIATION et al.,
Defendants and Respondents.

494

**COUNSEL**

Terry Steinhart for Plaintiff and Appellant.

Jamoa A. Moberly, Schell & Delamer, Steven J. Revitz and Raiskin & Revitz for Defendants and Respondents.

**OPINION**

**BROUSSARD, J.**—The question presented is whether a condominium owners association and the individual members of its board of directors may be held liable for injuries to a unit owner caused by third-party criminal conduct. Plaintiff, Frances T., brought suit against the Village Green Owners Association (the Association)[1] and individual members of its board of directors for injuries sustained when she was attacked in her condominium unit, a part of the Village Green Condominium Project (Project). Her complaint stated three causes of action: negligence, breach of contract and breach of fiduciary duty. The trial court sustained defendants' general demurrers to plaintiff's three causes of action without leave to amend and entered a judgment of dismissal. Plaintiff appealed.

I.

On the night of October 8, 1980, an unidentified person entered plaintiff's condominium unit under cover of darkness and molested, raped and robbed

---

[1]Plaintiff erroneously refers to the named party as the Village Green Condominium Project. The correct name is the Village Green Owners Association. The Association is a nonprofit corporation, rather than an unincorporated association.

her. At the time of the incident, plaintiff's unit had no exterior lighting. ██ ██ ██ ██ The manner in which her unit came to be without exterior lighting on this particular evening forms the basis of her lawsuit against the defendants.[2]

The Association, of which plaintiff was a member, is a nonprofit corporation composed of owners of individual condominium units. The Association was formed and exists for the purposes set forth in the Project's declaration of covenants, conditions and restrictions (CC&Rs). The board of directors (board) exercises the powers of the Association and conducts, manages and controls the affairs of the Project and the Association. Among other things the Association, through its board, is authorized to enforce the regulations set forth in the CC&Rs. The Association, through the board, is also responsible for the management of the Project and for the maintenance of the Project's common areas.

At the time of the incident, the Project consisted of 92 buildings, each containing several individual condominium units, situated in grassy golf course and parklike areas known as "courts." Plaintiff's unit faced the largest court. She alleges that "the lighting in [the] park-like area was exceedingly poor, and after sunset, aside from the miniscule park light of plaintiff's, the area was in virtual . . . darkness. Of all the condominium units in [plaintiff's court] . . . plaintiff's unit was in the darkest place."

Throughout 1980, the Project was subject to what plaintiff terms an "exceptional crimewave" that included car thefts, purse snatchings, dwelling burglaries and robberies. All of the Project's residents, including the board, were aware of and concerned about this "crimewave." From January through July 1980, articles about the crimewave and possible protective measures were published in the Association's newsletter and distributed to the residents of the Project, including the directors. The newsletters show

---

[2]Since this case arises from the sustaining of a demurrer, we must assume that the factual allegations in the complaint are true. (*O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 802 [142 Cal.Rptr. 487].) In testing the sufficiency of a complaint against a demurrer, we are guided by the well settled rule that "a general demurrer admits the truth of all material factual allegations in the complaint [citation]; that the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court [citations]; and that plaintiff need only plead facts showing that [she] may be entitled to some relief [citation]." (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].) The facts are taken from plaintiff's first amended complaint.

that residents, including the directors, were aware of some of the residents' complaints regarding lighting.[3]

In early 1980 the board began to investigate what could be done to improve the lighting in the Project. The investigation was conducted by the Project's architectural guidelines committee.

Plaintiff's unit was first burglarized in April 1980. Believing the incident would not have occurred if there had been adequate lighting at the end of her court, plaintiff caused the following item to be printed in the Association's newsletter: "With reference to other lighting, Fran [T.] of Ct 4, whose home was entered, feels certain (and asked that this be mentioned) that the break-in would not have occurred if there had been adequate lighting at the end of her Court. This has since been corrected. We hope other areas which need improvement will soon be taken care of. . . ."[4]

In May 1980 plaintiff and other residents of her court had a meeting. As court representative plaintiff transmitted a formal request to the Project's manager with a copy to the board that more lighting be installed in their court as soon as possible.[5]

Plaintiff submitted another memorandum in August 1980 because the board had taken no action on the previous requests. The memorandum stated that none of the lighting requests from plaintiff's court had been responded to. Plaintiff also requested that a copy of the memorandum be placed in the board's correspondence file.

By late August, the board had still taken no action. Plaintiff then installed additional exterior lighting at her unit, believing that this would protect her

---

[3]Many of the Association's newsletters were attached to the complaint as exhibits. The newsletters included such items as: "LIGHTS! LIGHTS! LIGHTS! You are doing a disservice to your neighbors as well as yourself if you keep your front and back doors in darkness. Many who live upstairs are able to gaze out on the Green at night and see perfectly the presence or absence of a prowler where there is a lighted doorway. But where porches are shrouded in darkness, NOTHING is visible. AS A CIVIC DUTY—WON'T YOU KEEP THOSE LIGHTS ON? If you would like to try out a Sensor Light on a 30-day trial basis to see how efficient and economical it is, we are sure it can be arranged through the Court Council and Court Reps."

[4]Plaintiff, of course, alleges that nothing was done to correct the lighting problem.

[5]The letter stated:

"June 12, 1980. REPORT FROM YOUR COURT REP. . . . It was requested that the following items be relayed to the on-site mgr. for consideration and action if possible.

"1. Lights be installed on the northeast corner of bldg. 18 promptly.

". . .

". . . Item No. 1 above was put into the form of a motion with the request that action be taken on this item particularly by the site manager. . . ."

from crime. In a letter dated August 29, 1980, however, the site manager told plaintiff that she would have to remove the lighting because it violated the CC&Rs. Plaintiff refused to comply with this request. After appearing at a board meeting, where she requested permission to maintain her lighting until the board improved the general lighting that she believed to be a hazard, she received a communication from the board stating in part: "The Board has indicated their appreciation for your appearance on October 1, and for the information you presented to them. After deliberation, however, the Board resolved as follows: [¶] You are requested to remove the exterior lighting you added to your front door and in your patio and to restore the Association Property to its original condition on or before October 6. If this is not done on or before that date, the Association will have the work done and bill you for the costs incurred."

The site manager subsequently instructed plaintiff that pending their removal, she could not use the additional exterior lighting. The security lights had been installed using the same circuitry used for the original exterior lighting and were operated by the same switches. In order not to use her additional lighting, plaintiff was required to forego the use of all of her exterior lights. In spite of this, however, plaintiff complied with the board's order and cut off the electric power on the circuitry controlling the exterior lighting during the daylight hours of October 8, 1980. As a result, her unit was in total darkness on October 8, 1980, the night she was raped and robbed.

## II.

### Negligence

In her first cause of action plaintiff alleged that the Association and the board negligently failed to complete the investigation of lighting alternatives within a reasonable time, failed to present proposals regarding lighting alternatives to members of the Association, negligently failed to respond to the requests for additional lighting and wrongfully ordered her to remove the lighting that she had installed. She contends that these negligent acts and omissions were the proximate cause of her injuries.

The fundamental issue here is whether petitioners, the condominium Association and its individual directors, owed plaintiff the same duty of care as would a landlord in the traditional landlord-tenant relationship. We conclude that plaintiff has pleaded facts sufficient to state a cause of action for negligence against both the Association and the individual directors.

A. *The Association's Duty of Care.*

 The scope of a condominium association's duty to a unit owner in a situation such as this is a question of first impression. Plaintiff contends, and we agree, that under the circumstances of this case the Association should be held to the same standard of care as a landlord.

Defendants based their demurrer to the negligence cause of action on the theory that the Association owed no duty to plaintiff to improve the lighting outside her unit. The Association argues that it would be unfair to impose upon it a duty to provide "expensive security measures" when it is not a landlord in the traditional sense, but a nonprofit association of homeowners. The Association contends that under its own CC&Rs, it cannot permit residents to improve the security of the common areas without prior written permission, nor can it substantially increase its limited budget for common-area improvements without the approval of a majority of the members.

██ ██ ██ ██ But regardless of these self-imposed constraints, the Association is, for all practical purposes, the Project's "landlord."[6] And traditional tort principles impose on landlords, no less than on home-owner associations that function as a landlord in maintaining the common areas of a large condominium complex, a duty to exercise due care for the residents' safety in those areas under their control. (See, e.g., *Kwaitkowski v. Superior Trading Co.* (1981) 123 Cal.App.3d 324, 328 [176 Cal.Rptr. 494]; *O'Hara v. Western Seven Trees Corp., supra,* 75 Cal.App.3d 798, 802-803; *Kline v. 1500 Massachusetts Avenue Apartment Corp.* (1970) 141 App.D.C. 370 [439 F.2d 477, 480-481, 43 A.L.R.3d 311]; *Scott v. Watson* (1976) 278 Md. 160 [359 A.2d 548, 552].)

Two previous California decisions support our conclusion that a condominium association may properly be held to a landlord's standard of care

---

[6]Petitioners also suggest that even if the Association and its ruling board function as would a landlord in a rental complex of similar size, plaintiff's status as a unit owner—rather than defendants' effective control over the common areas—should determine the Association's duty of care. We disagree that an unincorporated association has no existence apart from that of its members. (See *Marshall v. International Longshoremen's & Warehousemen's Union* (1962) 57 Cal.2d 781, 783-784 [22 Cal.Rptr. 211, 371 P.2d 987]; *White v. Cox* (1971) 17 Cal.App.3d 824, 830 [95 Cal.Rptr. 259, 45 A.L.R.3d 1161].) Constitutional and common law protections do not lose their potency merely because familiar functions are organized into more complex or privatized arrangements. (See, e.g., *PruneYard Shopping Center v. Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]; *Shelley v. Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441]; *Marsh v. Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276].) Similarly, a homeowner's association and its board may not enforce provisions of the CC&Rs in a way that violates statutory or common law. (See *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427].)

as to the common areas under its control. In *White* v. *Cox, supra,* 17 Cal.App.3d 824, the court held that a condominium owner could sue the unincorporated association for negligently maintaining a sprinkler in a common area of the complex. In so holding, the court recognized that the plaintiff, a member of the unincorporated association, had no "effective control over the operation of the common areas . . . for in fact he had no more control over operations than he would have had as a stockholder in a corporation which owned and operated the project." (*Id.,* at p. 830.)[7] Since the condominium association was a management body over which the individual owner had no effective control, the court held that the association could be sued for negligence by an individual member.

In *O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d 790, this court held that the Association's restriction limiting residency in the project to persons over 18 years of age was a violation of the Unruh Civil Rights Act (Civ. Code, § 51).[8] In so doing, we were mindful of the Association's role in the day-to-day functioning of the project: "Contrary to the association's attempt to characterize itself as but an organization that 'mows lawns' for owners, the association in reality has a far broader and more businesslike purpose. The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629-unit project. . . . *In brief, the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders.*" (*O'Connor* v. *Village Green Owners Assn., supra,* 33 Cal.3d 790, 796, italics added.)[9]

---

[7]The court's analogy is particularly apt because the case before us involves a plaintiff who is a member of a nonprofit incorporated association. It has been observed that "under the new nonprofit mutual benefit corporation law, members are like shareholders in a business corporation." (Hanna, Cal. Condominium Handbook (1975) p. 77.)

[8]Section 51 provides in relevant part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

[9]We also take judicial notice of the fact that a rapidly growing share of California's population reside in condominiums, cooperatives and other types of common-interest housing projects. Homeowner associations manage the housing for an estimated 15 percent of the American population and, for example, as much as 70 percent of the new housing built in Los Angeles and San Diego Counties. (See Bowler & McKenzie, *Invisible Kingdoms* (Dec. 1985) Cal. Law., at p. 55.) Nationally, "[t]hey are growing at a rate of 5,000 a year and represent more than 50 percent of new construction sales in the urban areas. Projects average about 100 units each, so the associations affect some 10 million owners," according to C. James Dowden, executive vice president of the Community Association Institute in Alexandria, Virginia. (*Ibid.*) According to Bowler & McKenzie, *supra,* housing experts estimate that there already are 15,000 common-interest housing associations in California. While in some projects the maintenance of common areas is truly cooperative, in most of the larger projects control of the common area is delegated or controlled by ruling bodies that do not exercise the members' collective will on a one-person, one-vote basis. (*Ibid.*)

Since there are no reported California cases dealing with the liability of a condominium association in a situation such as this, the parties have analogized this case to four landlord-tenant cases involving similar facts. The reasoning employed by this line of landlord-tenant cases is equally applicable here. In two of these cases the courts found the landlord liable, while in the other two they declined to do so.

*O'Hara* v. *Western Seven Trees Corp., supra,* 75 Cal.App.3d 798 established that in some instances a landlord has a duty to take reasonable steps to protect a tenant from the criminal acts of third parties and may be held liable for failing to do so. In *O'Hara* plaintiff alleged that the defendant landlords were aware that a man had raped several tenants and additionally "were aware of the conditions indicating a likelihood that the rapist would repeat his attacks." (*Id.,* at p. 802.) In addressing the question of the landlords' liability the court observed: "Traditionally, a landlord had no duty to protect his tenants from the criminal acts of others, but an innkeeper was under a duty to protect his guests. [Citations.] But in recent years, the landlord-tenant relationship, at least in the urban, residential context, has given rise to liability under circumstances where landlords have failed to take reasonable steps to protect tenants from criminal activity. [Citations.] . . . *[S]ince only the landlord is in the position to secure common areas, he has a duty to protect against types of crimes of which he has notice and which are likely to recur if the common areas are not secure.* . . . [Citations.]" (*Id.,* at pp. 802-803, italics added. See also *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 806-807 [205 Cal.Rptr. 842, 685 P.2d 1193].)

The court concluded that, as in the case before us, plaintiff had alleged the most important factor pointing to the landlord's liability: foreseeability. "[The landlords] allegedly knew of the past assaults and of conditions making future attacks likely. By not acting affirmatively to protect [the plaintiff], they increased the likelihood that she would also be a victim." (*Id.,* at p. 804.)[10] Moreover, "evidence of prior similar incidents is not the sine

---

[10]The court also concluded that several sections of the Restatement Second of Torts suggest that landlords can be held liable under certain circumstances for injuries inflicted during criminal assaults on tenants. Section 302B provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, *even though such conduct is criminal.*" (Italics added.)

Section 448 provides: "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, *unless the actor* at the time of his negligent conduct *realized or should have realized the likelihood* that such a situation might be created, and *that a third person might*

qua non of a finding of foreseeability." (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 127 [211 Cal.Rptr. 356, 695 P.2d 653].) "[F]oreseeability is determined in light of all the circumstances and not by a rigid application of a mechanical 'prior similars' rule." (*Id.*, at p. 126.)

Similarly, in *Kwaitkowski* v. *Superior Trading Co.*, *supra,* 123 Cal.App.3d 324, the court held that the plaintiff had stated a cause of action against the landlords for negligence in failing to protect her from assault, battery, rape and robbery by a person who had accosted her in the dimly lit lobby of an apartment building. The facts, as alleged, indicated that complaints by tenants and a prior assault on a tenant provided the landlords with notice of the injuries that might result from the level of crime in the area. The landlords also had notice that a defective lock on the lobby entrance door was allowing strangers access to the building. Relying primarily on *O'Hara,* the court concluded that the plaintiff had alleged facts sufficient to show that her injuries were the foreseeable result of the landlord's negligence in maintaining the entrance door. (See also *Sherman* v. *Concourse Realty Corporation* (1975) 47 App.Div.2d 134 [365 N.Y.S.2d 239]; *Holley* v. *Mt. Zion Terrace Apartments, Inc.* (Fla.App. 1980) 382 So.2d 98; *Spar* v. *Obwoya* (D.C.App. 1977) 369 A.2d 173; *Johnston* v. *Harris* (1972) 387 Mich. 569 [198 N.W.2d 409]; *Warner* v. *Arnold* (1974) 133 Ga.App. 174 [210 S.E.2d 350].)

As in *O'Hara* and *Kwaitkowski,* it is beyond dispute here that the Association, rather than the unit owners, controlled the maintenance of the common areas. This is clearly illustrated by the fact that when plaintiff attempted to improve security by installing additional exterior lighting, the board ordered her to remove them because they were placed in an area over which the Association exercised exclusive authority.

Defendants further contend that even if the landlord-tenant standard of care is applicable, under this standard the Association owed no duty to the plaintiff. Defendants rely primarily upon *7735 Hollywood Blvd. Venture* v. *Superior Court* (1981) 116 Cal.App.3d 901 [172 Cal.Rptr. 528] and *Riley* v. *Marcus* (1981) 125 Cal.App.3d 103 [177 Cal.Rptr. 827] for this contention. Both cases are factually distinguishable from the case before us primarily because the alleged prior criminal acts were not of a nature that would create a duty to better secure the common areas. Both cases are legally questionable because in *Isaacs* v. *Huntington Memorial Hospital,*

avail himself of the opportunity to *commit such a tort or crime.*" (Italics added.)

Section 449 provides: "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, *or criminal* does not prevent the actor from being liable for harm caused thereby." (Italics added.)

*supra,* 38 Cal.3d 112, we explicitly rejected the "rigidified foreseeability concept" applied by the court in *Riley* and adopted the court's conclusion in *Kwaitkowski* that "'[f]oreseeability does not require prior identical or even similar events.'" (38 Cal.3d at p. 127.)

The facts alleged here, if proven, demonstrate defendant's awareness of the need for additional lighting and of the fact that lighting could aid in deterring criminal conduct, especially break-ins. As in *O'Hara* and *Kwaitkowski,* the Association was on notice that crimes were being committed against the Project's residents. Correspondence from plaintiff and other residents of her court, along with the articles in the Project's newsletter, demonstrate affirmatively that defendant was aware of the link between the lack of lighting and crime.

Plaintiff's unit had, in fact, been recently burglarized and defendant knew this. It is not necessary, as defendant appears to imply, that the prior crimes be *identical* to the ones perpetrated against the plaintiff. (*Isaacs* v. *Huntington Memorial Hospital, supra,* 38 Cal.3d 112; *Kwaitkowski, supra,* 123 Cal.App.3d at p. 329.) Defendant need not have foreseen the *precise* injury to plaintiff so long as the possibility of this type of harm was foreseeable. (*Isaacs, supra; Kwaitkowski, supra,* at p. 330.)

Thus, plaintiff has alleged facts sufficient to show the existence of a duty, that defendant may have breached that duty of care by failing to respond in a timely manner to the need for additional lighting and by ordering her to disconnect her additional lights, and that this negligence—if established—was the legal cause of her injuries.

## B. *Directors' Duty of Care.*

Plaintiff's first cause of action also alleged that the individual directors on the Association's board breached a duty of care they owed to her by ordering her to remove the external lighting she had installed for her protection and by failing to repair the Project's hazardous lighting condition within a reasonable period of time.

It is well settled that corporate directors cannot be held *vicariously* liable for the corporation's torts in which they do not participate. Their liability, if any, stems from their own tortious conduct, not from their status as directors or officers of the enterprise. (See *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d 770].) "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable

for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct." (*Teledyne Industries, Inc.* v. *Eon Corporation* (S.D.N.Y. 1975) 401 F.Supp. 729, 736-737 (applying Cal. law), affd. (2d Cir. 1976) 546 F.2d 495.)

Directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 1 Cal.3d 586, 595; *Dwyer* v. *Lanan & Snow Lumber Co.* (1956) 141 Cal.App.2d 838, 841 [297 P.2d 490]; accord *Thomsen* v. *Culver City Motor Co., Inc.* (1935) 4 Cal.App.2d 639, 644-645 [41 P.2d 597]; see also *Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 785 [157 Cal.Rptr. 392, 598 P.2d 45]; *Middlesex Ins. Co.* v. *Mann* (1981) 124 Cal.App.3d 558, 574 [177 Cal.Rptr. 495]; *O'Connell* v. *Union Drilling & Petroleum Co.* (1932) 121 Cal.App. 302 [8 P.2d 867]; *Tillman* v. *Wheaton-Haven Recreation Ass'n, Inc.* (4th Cir. 1975) 517 F.2d 1141, 1144; *Teledyne Industries, Inc.* v. *Eon Corporation, supra,* 401 F.Supp. 729, 736-737 (applying Cal. law); cf. *Price* v. *Hibbs* (1964) 225 Cal.App.2d 209, 222 [37 Cal.Rptr. 270].)

█ Directors are liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable. (See, e.g., *Tillman* v. *Wheaton-Haven Recreation Ass'n, Inc., supra,* 517 F.2d 1141, 1144 ["a director who actually votes for the commission of a tort is personally liable, even though the wrongful act is performed in the name of the corporation"]; and see rule and authorities cited in 3A Fletcher, Cyclopedia of the Law of Private Corporations (Perm. ed. 1986) §§ 1135-1138, pp. 267-298; 18B Am.Jur.2d (1985) Corporations, §§ 1877-1880, pp. 723-729; Knepper, Liability of Corporate Officers and Directors (3d ed. 1978) § 5.08 and (1985 supp.) § 5.08; 1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1986) § 101, at pp. 6-3, 6-4; 19 C.J.S., Corporations, § 845, at pp. 271-273.)[11] This liability does not depend on the same grounds as "piercing the corporate veil," on account of inadequate capitalization for instance, but rather on the officer or director's personal participation or specific authorization of the tortious act. (See 18B Am.Jur.2d, *supra,* § 1877, at p. 726.)

---

[11]The fact that directors receive no compensation for their services does not exonerate them from liability that otherwise attaches for a breach of duty. Corporations Code section 7230, subdivision (a) provides, in the context of directors' fiduciary duty to a nonprofit mutual benefit corporation, that "[a]ny duties and liabilities set forth in this article shall apply without regard to whether a director is compensated by the corporation." (See, e.g., *Virginia-Carolina Chemical Co.* v. *Ehrich* (D.C.S.C. 1916) 230 Fed. 1005, 1015-1016; *Weidner* v. *Engelhart* (N.D. 1970) 176 N.W.2d 509, 518; 19 C.J.S., Corporations, § 863, p. 297.)

██ This rule has its roots in the law of agency. Directors are said to be agents of their corporate principal. (Corp. Code, § 317, subd. (a).) ██ And "[t]he true rule is, of course, that the agent is liable for his own acts, regardless of whether the principal is liable or amenable to judicial action." (*James* v. *Marinship Corp.* (1944) 25 Cal.2d 721, 742-743 [155 P.2d 329, 160 A.L.R. 900].) ██ Moreover, directors are not subordinate agents of the corporation; rather, their role is as their title suggests: they are policymakers who direct and ultimately control corporate conduct. Unlike ordinary employees or other subordinate agents under their control, a corporate officer is under no compulsion to take action unreasonably injurious to third parties. But like any other employee, directors individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties. The reason for this rule is that otherwise, a director could inflict injuries upon others and then escape liability behind the shield of his or her representative character, even though the corporation might be insolvent or irresponsible. (See *O'Connell* v. *Union Drilling & Petroleum Co.*, *supra*, 121 Cal.App. 302; 18B Am.Jur.2d, *supra*, at p. 729, fn. 13.) Director status therefore neither immunizes a person from individual liability nor subjects him or her to vicarious liability.

Since this appeal follows a dismissal based on plaintiff's failure to state a cause of action, we must next determine the nature of the duty the individual defendants owed to plaintiff. In *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.*, *supra*, we discussed the two traditional limitations on a corporate officer's or director's personal liability for negligence. First, we concluded that no special agency relationship imposed personal liability on the defendant corporation's president for failing to prevent economic harm to the plaintiff corporation, a client of his principal. This conclusion reflected the oft-stated disinclination to hold an agent personally liable for economic losses when, in the ordinary course of his duties to his own corporation, the agent incidentally harms the pecuniary interests of a third party. "Liability imposed upon agents for active participation in tortious acts of the principal have been mostly restricted to cases involving physical injury, not pecuniary harm, to third persons [citations]." (1 Cal.3d at p. 595.) Since the harm in that case was pecuniary in nature and resulted from good faith business transactions, we analyzed liability under principles of agency law and denied recovery against the officer as an individual. (*Ibid.*)

██ In *Haidinger-Hayes*, we also restated the traditional rule that directors are not personally liable to third persons for negligence amounting merely to a breach of duty the officer owes to the corporation alone. "[T]he act must also constitute a breach of duty owed to the third person. . . . More must be shown than breach of the officer's duty *to his corporation* to

impose personal liability *to a third person* upon him." (1 Cal.3d at p. 595, italics in original.) In other words, a distinction must be made between the director's fiduciary duty to the corporation (and its beneficiaries) and the director's ordinary duty to take care not to injure third parties.[12] ██ ██ ██ ██ ██ The former duty is defined by statute,[13] the latter by common law tort principles.

██ Thus, if plaintiff's complaint had alleged only that the Association's CC&Rs and bylaws delegated to the directors a general duty to conduct the affairs of the organization, including the control and management of its property, then she would not have stated a cause of action. It is true that the residents were forced to rely on the directors to oversee management of the property; however, it would be insufficient to allege that because the directors had a duty as agents of the Association to manage its property and to conduct its affairs, that they also necessarily owed a *personal duty* of care to plaintiff regardless of their specific knowledge of the allegedly dangerous condition that led to her injury. As this court suggested in *Haidinger-Hayes,* such a broad application of agency principles to corporate decision-makers would not adequately distinguish the directors' duty of care to third persons, which is quite limited, from their duty to supervise broad areas of corporate activity. Virtually any aspect of corporate conduct can

---

[12]Like any other citizen, corporate officers have a societal duty to refrain from acts that are unreasonably risky to third persons even when their shareholders or creditors would agree that such conduct serves the institution's best interests. One court succinctly summarized this distinction between a director's institutional duty to corporate insiders and the duty every person owes to the world. "[A]n officer or director of a corporation owes a duty to the corporation which is separate and independent of any duty which he may owe to an employee or to a third person. . . . If he fails to perform a duty owed to the corporation, he may be answerable to that corporation for the damages which it sustained because of his failure or neglect. . . . [¶] The only duty which an executive officer of a corporation owes to a third person, whether he be an employee of the corporation or a complete stranger, is the same duty to exercise due care not to injure him which any person owes to another. If an injury is sustained by a third party as the result of the independent negligence of the corporate officer, or as the result of a breach of the duty which that officer, as an individual, owes to the third party, then the injured third party may have a cause of action for damages against the officer personally." (*Saucier* v. *U.S. Fidelity and Guaranty Company* (La.App. 1973) 280 So.2d 584, 585-586.)

[13]The legislative comments indicate that section 7231, the standard of fiduciary responsibility for nonprofit directors, incorporates the standard of care defined in Corporations Code section 309. (See Legis. Committee com., Deering's Ann. Corp. Code (1979) foll. § 7231, p. 205; see also 1B Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1984) § 406.01, p. 19-192.) Section 309 defines the standard for determining the personal liability of a director for breach of his fiduciary duty to a profit corporation.

Sections 7231 and 309 provide, in relevant part: "A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." In addition, a director is entitled to rely on information, opinions and reports provided by the persons specified in the statute. (§ 7231, subd. (b); § 309, subd. (b).)

be alleged to have been explicitly or implicitly ratified by the directors. But their authority to oversee broad areas of corporate activity does not, without more, give rise to a duty of care with regard to third persons who might foreseeably be injured by the corporation's activities. "Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done." (1 Cal.3d at p. 595.)

On the other hand, we must reject the defendant directors' assertion that a director's liability to *third persons* is controlled by the statutory duty of care he or she owes to the corporation, a standard defined in Corporations Code section 7231. ■■■ This statutory standard of care, commonly referred to as the "business judgment rule," applies to parties (particularly shareholders and creditors) to whom the directors owe a fiduciary obligation.[14] ■■ ■■■ ■■ ■■ It does not abrogate the common law duty which every person owes to others—that is, a duty to refrain from conduct that imposes an unreasonable risk of injury on third parties.[15] The legal

---

[14]The "business judgment rule" exists in one form or another in every American jurisdiction. (See 3A Fletcher, Cyclopedia of the Law of Private Corporations, *supra*, § 1039.) Nevertheless, no case or treatise we have unearthed mentions corporate officers or directors as a category of defendants who (like infants or public officials) enjoy some limited immunity, under the common law or by statute, from personal liability for their own tortious conduct. (See, e.g., Prosser & Keeton, The Law of Torts (5th ed. 1984) §§ 131-135, pp. 1032-1075.)

The business judgment rule has been justified primarily on two grounds. First, that directors should be given wide latitude in their handling of corporate affairs because the hindsight of the judicial process is an imperfect device for evaluating business decisions. Second, "[t]he rule recognizes that shareholders to a very real degree voluntarily undertake the risk of bad business judgment; investors need not buy stock, for investment markets offer an array of opportunities less vulnerable to mistakes in judgment by corporate officers." (18B Am.Jur.2d, *supra*, § 1704, at pp. 556-557.) Of course, a tort victim cares little whether the tortfeasor acted in good faith to maximize the interests of the enterprise. Unlike shareholders challenging an unprofitable decision, a tort victim's exposure to the risk of harm is generally involuntary and uncompensated. And unlike the review of business judgments that affect only the pecuniary interests of investors, courts have a long and distinguished record of deciding whether a defendant's personal conduct imposed an unreasonable risk of injury on the plaintiff.

[15]The dissent has not cited a single case from any jurisdiction in which directors' liability in tort to third persons has been governed by the business judgment rule. To the contrary, the cases have uniformly applied common law tort principles. In one case, *Bowes v. Cincinnati Riverfront Coliseum, Inc.* (1983) 12 Ohio App. 3d 12 [465 N.E.2d 904], the court questioned whether the state legislature intended the rule to govern the relationship between directors and third persons, and not just the fiduciary duty directors owe to their corporation. However, even in that case the court followed the general rule of law, which it summarized as follows: "A corporate officer is individually liable for injuries to a third party when the corporation owes a duty of care to the third person, the corporation delegates that duty to the officer, the officer breaches that duty through personal fault (whether by malfeasance, misfeasance, or nonfeasance), and the third person is injured as a proximate result of the officer's breach of that duty." (*Id.*, at pp. 910-912; *Schaefer v. D & J Produce, Inc.* (1978) 62 Ohio App.2d 53 [403 N.E.2d 1015, 1016]; *Saucier v. U.S. Fidelity and Guaranty Company, supra,* 280

fiction of the corporation as an independent entity—and the special benefit of limited liability permitted thereby—is intended to insulate stockholders from personal liability for corporate acts and to insulate officers from liability for corporate contracts; the corporate fiction, however, was never intended to insulate officers from liability for their own tortious conduct.[16]

 To maintain a tort claim against a director in his or her personal capacity, a plaintiff must first show that the director specifically authorized, directed or participated in the allegedly tortious conduct (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 1 Cal.3d at p. 595); or that although they specifically knew or reasonably should have known that some hazardous condition or activity under their control could injure plaintiff, they negligently failed to take or order appropriate action to avoid the harm (*Dwyer* v. *Lanan & Snow Lumber Co., supra,* 141 Cal.App.2d 838; see also Fletcher, Cyclopedia of the Law of Private Corporations, *supra,*

---

So.2d 584, 585-587; see generally 3A Fletcher, Cyclopedia of the Law of Private Corporations, *supra,* §§ 1135, 1137, at pp. 267-295; 18B Am.Jur.2d, *supra,* §§ 1877-1878, 1880, at pp. 723-729.)

The statutory scheme that governs the indemnification of directors (Corp. Code, §§ 7237, 317 and 5238) also militates against the dissent's unique notion that the business judgment rule defines both the fiduciary duty directors owe to their shareholders *and* the standard of care they owe to third parties who might be injured by their personal conduct. If the dissent is correct, then subdivision (b) of sections 7237, 317 and 5238 would appear to be meaningless, or at best redundant of subdivision (c). In each section, subdivision (d) mandates that a director who successfully defends against an action described in either subdivision (b) or (c) shall be indemnified for the expense incurred. Subdivision (c) empowers the enterprise to indemnify a director sued "by or in the right of the corporation" *only* "if such person acted in good faith, in a manner such person believed to be in the best interests of the corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." Subdivision (b) empowers the enterprise to indemnify a director "made a party to any proceeding (other than an action by or in the right of the corporation . . .) . . . if such person acted in good faith and in a manner such person *reasonably* believed to be in the best interests of the corporation. . . ." Subdivision (b), unlike subdivision (c), does not mention the care an "ordinarily prudent person" would use, presumably because the director is being held liable to a third party precisely for failing to use such care. This bifurcation of all three indemnity statutes suggests that the Legislature anticipated that directors could be held personally liable in situations where they nevertheless acted "in good faith and in a manner such person reasonably believed to be in the best interests of the corporation." (Subd. (b).) In such a situation the corporation is allowed to indemnify the director because, though liable, the director has not breached his or her fiduciary duty to the corporation. Where the director breaches that fiduciary duty, then both subdivisions (b) and (c) preclude indemnification regardless of whether the suit was brought by a third party or by an insider as a derivative action.

[16]Although a director's fiduciary and common law duties are distinct, as a practical matter we recognize that a director's responsibility to the corporation cannot be completely divorced from the public responsibility of the corporation itself. A corporation is a citizen in society, and as such is expected to conform to societal laws and norms. Typically, the corporation's best interests will be served by complying with those laws and norms, if only because of the sanctions which may result from noncompliance. A director who causes his or her corporation to embark upon a course of unlawful or tortious conduct may, as a consequence, be exposed to liability from both within and without the corporation if the conduct falls below the statutory standard.

at p. 268; Annot., Personal Civil Liability of Officer or Director of Corporation for Negligence of Subordinate Corporate Employee Causing Personal Injury or Death of Third Person (1979) 90 A.L.R.3d 916). The plaintiff must also allege and prove that an ordinarily prudent person, knowing what the director knew at that time, would not have acted similarly under the circumstances.

■ Although the statutory business judgment rule defined in sections 7231 and 309 concerns only the director's fiduciary duty to the corporation, and not to outsiders, we recognize—as the Legislature did—that "[t]he reference to 'ordinarily prudent person' emphasizes the long tradition of the common law, in contrast to standards that might call for some undefined degree of expertise, like 'ordinarily prudent businessman.'" (Legislative Committee com., Deering's Ann. Corp. Code (1977) foll. § 309, p. 205.) We are mindful that directors sometimes must make difficult cost-benefit choices without the benefit of complete or personally verifiable information. ■ For this reason, even if their conduct leads directly to the tortious injury of a third party, directors are not personally liable in tort unless their action, including any claimed reliance on expert advice, was clearly unreasonable under the circumstances known to them at that time. This defense of reasonable reliance is necessary to avoid holding a director personally liable when he or she reasonably follows expert advice or reasonably delegates a decision to a subordinate or subcommittee in a better position to act.[17]

■ Under the facts as alleged by plaintiff, the directors named as defendants had specific knowledge of a hazardous condition threatening physical injury to the residents, yet they failed to take any action to avoid the harm; moreover, the action they did take may have exacerbated the risk by causing plaintiff's unit to be without any lighting on the night she was attacked. Plaintiff has thus pled facts to support two theories of negligence, both of which state a cause of action under the standard stated above.

First, plaintiff alleges that the directors took affirmative action that made the break-in more likely when they ordered her to immediately disconnect the lighting she had installed to protect herself from the foreseeable risk of

---

[17]Sections 7231 and 309 employ identical language to provide that "[i]n performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, . . . prepared" by various employees and experts whom "the director believes to be reliable and competent in the matters presented." A director who commits a tort because he *reasonably* relied on such information cannot be held *personally* liable for the harm that results.

another criminal break-in.[18] Plaintiff alleges that she installed the additional exterior lighting only after the board ignored repeated requests from residents of her court to improve the lighting condition. Since the directors were aware of the crimewave and that plaintiff had installed additional lighting to protect herself, they assumed a duty to exercise their discretion in a manner that would not increase her risk of injury from crimes that could foreseeably recur if the common areas were not secure. Instead, according to the complaint, the board's decision actually *increased* the risk of harm and was the legal cause of plaintiff's injuries. Since the additional lights were connected to the building circuits and switches, forcing her to immediately turn off all the exterior lights meant extinguishing all the additional lights. The break-in, rape and robbery occurred on the same night plaintiff complied with the board's order, with the result that the area outside her unit was cloaked in near-total darkness.

Second, plaintiff alleges that the individual directors breached a duty of care owed to her by failing to take action to repair the hazardous lighting condition within a reasonable period of time. Some six months passed between the time the board began to investigate complaints about the lighting and the second burglary of plaintiff's unit. The facts, as alleged, indicated that the directors had actual knowledge of the level and types of crime in the area, of complaints by residents that the lights provided inadequate security, and of the recent burglary of plaintiff's unit. Therefore, plaintiff alleged, the directors knew the lack of adequate lighting created a risk of recurring criminal activity, yet they failed to use reasonable care to alleviate the danger, even though the residents necessarily relied on the board to do so.

Directors and officers have frequently been held liable for negligent nonfeasance where they knew that a condition or instrumentality under their control posed an unreasonable risk of injury to the plaintiff, but then failed to take action to prevent it. (See *Dwyer* v. *Lanan & Snow Lumber Co.*, *supra*, 141 Cal.App.2d 838; *Saucier* v. *U.S. Fidelity & Guaranty Company*, *supra*, 280 So.2d 584; *Adams* v. *Fidelity and Casualty Co. of New York* (La.App. 1958) 107 So.2d 496; *Curlee* v. *Donaldson* (Mo.App. 1950) 233

---

[18]Section 11.2(b) of the CC&Rs provides: "Nothing shall be altered or constructed in or removed from the COMMON AREAS or the ASSOCIATION PROPERTY, except upon the written consent of the BOARD." Plaintiff's complaint alleges that the directors instructed her to remove the lighting on the ground that she had violated the CC&Rs by not securing the board's prior written consent and by not using a licensed electrician pursuant to a permit obtained from the city. But even assuming plaintiff violated the CC&Rs in this manner, nothing in the CC&Rs would have prevented the board from conditioning their approval on compliance with safety regulations or other standards, or from taking care not to leave her in a worse position. In any event, whether the directors acted reasonably under the circumstances is a question of fact, not a proper ground for dismissal for failure to state a claim.

S.W.2d 746; *Schaefer* v. *D & J Produce, Inc., supra,* 62 Ohio App.2d 53; see also *Preston-Thomas Const., Inc.* v. *Central Leasing Corp.* (Okl.App. 1973) 518 P.2d 1125, 1127; *Barnette* v. *Doyle* (Wyo. 1981) 622 P.2d 1349, 1355-1356. *Dwyer* is directly on point. In that case, the manager of a sawmill informed its president and director that a backline was poorly secured and might fall, as it had previously. The official failed to take any precautionary action within a reasonable period of time and was found liable to a person injured when the line subsequently fell. (141 Cal.App.2d at p. 841.) Although a director's obligation to complete a task is ordinarily a duty owed to the corporation alone, in the instant case, as in *Dwyer,* when the only persons in a position to remedy a hazardous condition are made specifically aware of the danger to third parties, then their unreasonable failure to avoid the harm may result in personal liability.[19]

In this case plaintiff's amended complaint alleges that each of the directors participated in the tortious activity. Under our analysis, this allegation is sufficient to withstand a demurrer. ██ ██ However, since only "a director who actually votes for the commission of a tort is personally liable, even though the wrongful act is performed in the name of the corporation" (*Tillman* v. *Wheaton-Haven Recreation Ass'n, Inc., supra,* 517 F.2d 1141, 1144; *Tillman* v. *Wheaton-Haven Recreation Ass'n* (1973) 410 U.S. 431, 440, fn. 12 [35 L.Ed.2d 403, 411, 93 S.Ct. 1090]), plaintiff will have to prove that each director acted negligently as an individual. Of course, the individual directors may then present evidence showing they opposed or did not participate in the alleged tortious conduct. (*Ibid.*)

Under the circumstances plaintiff has alleged particularized facts that state a cause of action for negligence against the individual directors. Of course, the directors may have acted quite reasonably under the circumstances—or the causal link between the lighting and plaintiff's injuries may

---

[19]Some courts have found an alternative basis for such a result in traditional principles of agency law, particularly sections 352 and 354 of the Restatement Second of Agency. Section 352 states that "[a]n agent is not liable for harm to a person other than his principal because of his failure adequately to perform his duties to his principal, unless physical harm results from reliance upon performance of the duties by the agent, or unless the agent has taken control of land or other tangible things." The comment to section 354 explains that an agent relied on to take some action for the protection of a person "should realize that, because reliance has been placed upon performance by him there is an undue risk that his failure will result in harm to the interests of the third person which are protected against negligent invasions." (Rest.2d Agency, § 354, com. a.) Here, the directors, as agents of the Association, undertook to fulfill the Association's duty to secure the common areas against the foreseeable criminal acts of third parties; having undertaken this duty and having induced the residents' reliance, they were not free to desist if doing so created an unreasonable risk of physical injury to the plaintiff. (See also *Miller* v. *Muscarelle* (1961) 67 N.J.Super. 305 [170 A.2d 437, 446-451], which explains the historical origins and defects of the traditional misfeasance-nonfeasance distinction in the context of corporate agency.)

be too remote—but those are questions for the trier of fact and not appropriate grounds for sustaining a general demurrer to plaintiff's claim. The trial court therefore erred when it sustained the defendant directors' demurrer to plaintiff's negligence cause of action against them and dismissed without leave to amend.

## III.

### Breach of Contract

In her second cause of action plaintiff alleges that the CC&Rs and the Association's bylaws formed a contract between the defendants and the members of the Association. She further alleges that the defendants were contractually obligated to "take reasonable steps to remedy the situation of inadequate exterior lighting and to refrain from instructing [her] to cut off the additional exterior lighting she had caused to be installed at her unit." We conclude that plaintiff has failed to state a cause of action against any of the defendants for breach of contract.[20]

Civil Code section 1355 provides that prior to the conveyance of any condominium in a project the owners of the project must "record a declaration of restrictions relating to such project, which restrictions shall be enforceable equitable servitudes where reasonable, and shall inure to and bind all owners of condominiums in the project." The servitudes may provide for, among other things, the establishment of a management body and for delineation of management's responsibilities, and any condominium owner has the right to enforce the servitudes. (Civ. Code, § 1355.) Plaintiff alleges that this document along with the Association's bylaws constituted a "contract" which was breached by the defendant's acts and omissions.

The rights and responsibilities of contracting parties are determined by the terms of their contract. (*Diamond Bar Dev. Corp.* v. *Superior Court* (1976) 60 Cal.App.3d 330, 333 [131 Cal.Rptr. 458]; Civ. Code, § 1638; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 522, p. 445.) Here, plaintiff's contract with defendants consists of the CC&Rs and the bylaws contained in the grant deed for plaintiff's condominium.

Plaintiff's allegation that defendants breached that contract by failing to install additional lighting must fail because she does not allege that any

---

[20]The board members may not be held personally liable absent allegations that they entered into a contract with plaintiff on their own behalf or purported to bind themselves personally. (*United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc., supra,* 1 Cal.3d at p. 595.) No such allegation is made here and accordingly the discussion is limited to the question of the Association's liability.

provision in any of the writings imposed such an obligation on defendant. Plaintiff's contention that defendants breached a contract by requiring her to remove the lighting she had installed is also without merit. Contrary to plaintiff's claim, the CC&Rs expressly prohibited the installation of such lighting in common areas except with the prior approval of the board. By refusing to give plaintiff permission to install additional lighting and by ordering her to immediately disconnect her lighting, the board may have acted negligently as a landlord, but it did not breach any contractual obligation to the residents.

## IV.

### *Breach of Fiduciary Duty*

 Plaintiff's third cause of action, alleging that the CC&Rs and bylaws gave rise to a fiduciary duty defendants breached by their acts and omissions, must fail for a similar reason.

 Directors of nonprofit corporations such as the Association are fiduciaries who are required to exercise their powers in accordance with the duties imposed by the Corporations Code. (*Raven's Cove Townhomes, Inc.* v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 799 [171 Cal.Rptr. 334].) This fiduciary relationship is governed by the statutory standard that requires directors to exercise due care and undivided loyalty for the interests of the corporation. (*Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 274 [132 Cal.Rptr. 222]; Corp. Code, § 309, subd. (a), § 7231, subd. (a); 6 Witkin, Summary of Cal. Law, *supra,* § 80, p. 4378.) As concluded above, the Association and the Project's residents also stand in a common law relationship, similar to that of landlord and tenant, that requires the landlord to exercise reasonable care in protecting tenants from criminal activity.

Plaintiff therefore had a dual relationship with defendants. These two relationships and respective standards of care are related in this case only insofar as they concern the same parties. They must be analyzed separately, however, because a landlord and tenant do not generally stand in a fiduciary relationship (*Howe* v. *Pioneer Mfg. Co.* (1968) 262 Cal.App.2d 330, 343 [68 Cal.Rptr. 617]), and plaintiff has alleged no facts to show that these directors had a fiduciary duty to serve as the Project's landlord.

Plaintiff's reliance on *Raven's Cove, supra,* 114 Cal.App.3d 783, is therefore misplaced. In that case the homeowners acted as shareholders when they sued the developers, as directors, for breach of fiduciary duty that resulted in damage to the corporation. *Raven's Cove* is inapplicable

here because plaintiff alleged that the Association, as a landlord, breached its duty to her as a tenant rather than as a shareholder. Indeed, the defendants fulfilled their duty to plaintiff *as a shareholder* by strictly enforcing the provision in the CC&Rs that prohibited alteration of the common areas except with the prior written consent of the board. The directors had no *fiduciary duty* to exercise their discretion one way or the other with regard to plaintiff's lighting so long as their conduct conformed to the standard set out in section 7231. Since a good faith mistake in business judgment does not breach the statutory standard, plaintiff's third claim does not state a cause of action.

## V.

### *Conclusion*

We conclude that the trial court erred in sustaining the Association's and directors' demurrer to the negligence cause of action. We affirm dismissal of plaintiff's other causes of action. The judgment is therefore reversed and remanded to the trial court for further proceedings consistent with this opinion.

Bird, C. J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.**—I agree with my colleagues that the function of the Village Green Homeowners Association (Association) is analogous to that of a landlord and that the Association owed a duty to plaintiff to protect her from the foreseeable criminal acts of others. Further, I agree that plaintiff has stated a valid cause of action for negligence against the Association's directors under two theories. I write separately to discuss the cause of action based on the directors' failure to remedy the lighting problem in the Village Green Condominium Project (project).

The general rule is that corporate directors and officers are liable for corporate wrongs in which they actively participate. (19 C.J.S., Corporations, § 845, pp. 272-273; 18B Am.Jur.2d, Corporations, § 1877, pp. 723-724; *United States Liab. Ins. Co.* v. *Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d 770].)[1] In other words, a corporate director is liable if he or she is *personally* negligent or commits an intentional tort. Director status neither immunizes a person from individual liability nor subjects him or her to vicarious liability. (See 3A Fletcher, Cyclopedia

---

[1]These rules are simply applications of the law of agency to the corporate context. (See 19 C.J.S., Corporations, § 845, p. 271.) Directors are agents of their corporate principal. (See § 317, subd. (a); *Haidinger-Hayes, supra,* 1 Cal.3d at p. 595.)

of the Law of Private Corporations (1986) Liability of Directors and Officers to Third Persons for Torts, ch. XXIV, § 1137, pp. 275-276, hereafter Fletcher.)

As the majority note, plaintiff has stated a cause of action against the directors on two theories of negligence. First, plaintiff alleged that the directors acted negligently in ordering her to remove the additional lighting she had installed for her own protection. Where the negligence charged, as here, constitutes misfeasance, a defendant owes "'a duty of care to all persons who are foreseeably endangered by his conduct . . . .'" (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434-435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; accord Prosser & Keeton on Torts (5th ed. 1984) § 56, p. 374.) "It is thoroughly well settled that a person is personally liable for all torts committed by him, consisting in misfeasance—as fraud, conversion, acts done negligently, etc.—notwithstanding he may have acted as the agent or under directions of another. And this is true to the full extent as to torts committed by the officers or agents of a corporation in the management of its affairs." (Fletcher, *supra*, § 1135, p. 267.)[2]

Plaintiff alleged that the danger was foreseeable here because the directors knew that the project was experiencing a crimewave, that the project's lighting was inadequate, and that the inadequate lighting increased the likelihood of criminal conduct. Therefore, in deciding what to do about plaintiff's unauthorized lighting, the directors owed her a duty to exercise reasonable care. Plaintiff has sufficiently alleged that the directors breached that duty when they ordered her to take down the lights.

Second, plaintiff alleged that the directors negligently failed to take action to remedy the inadequate lighting in the project. This allegation constitutes a charge of nonfeasance. The question of the directors' liability under this

---

[2]The dissent argue that the directors' conduct in ordering plaintiff to remove the lights was not misfeasance because misfeasance "evidently denotes conduct that is blameworthy in itself, apart from its alleged causal connection to plaintiff's injury." (Dis. opn., *post*, at p. 524.) However, the distinction between nonfeasance and misfeasance does not depend upon the blameworthiness of the defendant's conduct, but upon the defendant's participation in the creation of the risk. "The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit [plaintiff] by interfering in his affairs." (Prosser & Keeton, *supra*, § 56, p. 373.)

In order to constitute misfeasance, defendant's act need not be blameworthy in the abstract, it need just increase the risk to plaintiff. "Participation by the defendant in the creation of the risk, even if such participation is innocent, is thus the crucial factor in distinguishing misfeasance from nonfeasance." (Weinrib, *The Case for a Duty to Rescue* (1980) 90 Yale L.J. 247, 256.) The dissent's definition of misfeasance more properly describes malfeasance. (See Annot., Liability of Servant to Third Person (1922) 20 A.L.R. 97, 104.)

theory is more complex than the issue of the directors' liability for misfeasance.

A corporate director's liability to third parties is commonly limited by the much-stated rule that a director is not liable to a third party for nonfeasance or breach of a duty owed to the corporation alone. (*Haidinger-Hayes, supra,* 1 Cal.3d at p. 595; see also 6 Witkin, Summary of Cal. Law (8th ed. 1974) Corporations, § 93, p. 4390; 19 C.J.S., Corporations, § 846, pp. 273-274.) This rule reflects the common law's disinclination to impose an affirmative duty to act for the benefit of another in the absence of a special relationship. (See *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36]; *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 435, fn. 5.)[3]

A director has a special relationship to a corporation by virtue of the fact that he acts as its agent. Therefore, he is liable to the corporation for nonfeasance or failure to perform his duties. However, failure to perform duties owed to the corporation will not result in liability to third parties unless the director has a special relationship with the third party such that he or she owes a duty to the third party to act affirmatively.

This rule is reflected in the law of agency generally. "[A]n agreement to carry out the purpose of the employer, which may be to help others, does not, without more, create a relation between the agent and the others upon

---

[3]The simple nonfeasance/misfeasance distinction has been justly criticized in the corporate director context as "an attempt to consider the violation of the duty before the duty itself— that is, . . . an attempt to lay down the rule that because there was a breach of duty by reason of misfeasance or malfeasance, therefore there was a duty to the third person, but that if the act was one of omission or nonfeasance, there was no duty to the third person." (18B Am.Jur.2d, Corporations, § 1889, p. 738.) Some courts have avoided the rule by holding that an agent's omission or failure to act is misfeasance, not nonfeasance, once the agent has undertaken a duty and has begun performance. (See *Richards* v. *Stratton* (1925) 112 Ohio St. 476 [147 N.E. 645, 646]; *Orcutt* v. *Century Bldg. Co.* (1906) 201 Mo. 424 [99 S.W. 1062, 1067-1068].) Other courts do not rely on the nonfeasance/misfeasance distinction but discuss the issue in terms of whether the directors owe a duty to the third party. (See *Adams* v. *Fidelity and Casualty Co. of New York* (La.App. 1958) 107 So.2d 496, 501-502.)

This duty analysis is helpful because it focuses on the crux of the issue, the director's relationship to the third party. "[T]he rule accepted in principle by the authorities is that a director, officer, or employee of a corporation is liable to third persons for injuries proximately resulting from his breach of duty to use care not to injure such persons, whether that breach is one of omission or commission. . . . On the other hand, a director, officer, or employee of a corporation is not liable for injuries to third persons if he has been guilty of no act or omission causing or contributing to such injury, or if he owes no duty to such third person to use care, such as where the breach of duty complained of is one owing only to the corporation." (18B Am.Jur.2d, Corporations, § 1889, pp. 738-740, fns. omitted; see also Fletcher, *supra,* § 1135, p. 268; *Haidinger-Hayes, supra,* 1 Cal.3d at p. 595 ["the act must also constitute a breach of duty owed to the third person"].)

which an action of tort can be brought for the harm which results from a *failure of the agent to perform his duty to the principal."* (See Rest.2d Agency, § 352, com. a, italics added.)

However, section 354 of the Restatement Second of Agency provides that "[a]n agent who, by promise or otherwise, undertakes to act for his principal under such circumstances that some action is necessary for the protection of the person or tangible things of another, is subject to liability to the other for physical harm to him or to his things caused by the reliance of the principal or of the other upon his undertaking and his subsequent unexcused failure to act, if such failure creates an unreasonable risk of harm to him and the agent should so realize." In some circumstances, a special relationship is created when an agent assumes a principal's duty to protect a third party.

Several states have applied section 354 to determine whether a corporation's officers or directors are liable to third parties for their negligent acts. (See, e.g., *Johnson* v. *Schneider* (La.App. 1972) 271 So.2d 579, 584-587; *Barnette* v. *Doyle* (Wyo. 1981) 622 P.2d 1349, 1355-1356; cf. *Schaefer* v. *D & J Produce, Inc.* (1978) 62 Ohio App.2d 53 [403 N.E.2d 1015, 1016, 1020-1021] [applying similar principles]; *Newman* v. *Forward Lands, Inc.* (E.D.Pa. 1976) 418 F.Supp. 134, 137 [applying Rest.2d Agency, § 352]; *Haidinger-Hayes, supra,* 1 Cal.3d at p. 595 [citing Rest.2d Agency, §§ 352 and 354 for the proposition that corporate directors are not liable for negligence absent physical harm to the third party].[4])

*Johnson* v. *Schneider, supra,* 271 So.2d 579, is particularly instructive. There, the court applied section 354 to determine whether directors/officers owed employees a duty to provide safe working conditions. The negligence alleged in *Johnson* was failure to provide adequate ventilation, safety equipment, or adequate warnings regarding the dust-laden atmosphere of the workplace. The corporation's duty to plaintiff to provide a safe work environment was clear. The question presented was whether that duty was shared by the directors/officers. (*Id.,* at p. 585.)

Construing section 354, the court in *Johnson* devised the following test. "[T]he operative factors giving rise to the duty toward a third person in instances of this nature are: (1) the existence of a duty on the part of the

---

[4]In *Haidinger-Hayes,* a corporate client sued the corporation and its president and principal officer for negligent handling of the client's business. The corporation was held liable. Although the corporate president had clearly participated in the negligence, this court held that he was not personally liable. (*Haidinger-Hayes, supra,* 1 Cal.3d at p. 595.) The court relied in part on the absence of physical harm and in part on the absence of a duty owed by the officer to the plaintiff. (*Ibid.*)

principal toward the third party; (2) delegation of that duty to an agent such as a corporate officer, director, stockholder or employee, and (3) acceptance of the delegated duty by the agent and the agent's undertaking the performance thereof as part of the agent's duties to his principal. When these factors co-exist, the agent assumes and incurs an obligation or duty to the third party.[5] The breach of the duty thus incurred subjects the agent to liability in tort to the third party thereby injured." (*Johnson* v. *Schneider, supra,* 271 So.2d at p. 586.)[6]

In light of this analysis, plaintiff states a cause of action when she alleges that the directors failed to: (1) properly investigate the lighting problem; (2) propose lighting alternatives to the Association's members; and (3) investigate lighting complaints. As a landlord, the Association had a duty to protect plaintiff from foreseeable criminal acts. (See maj. opn. at p. 499.) This duty was delegated to the directors in the Association's bylaws and its covenants, conditions and restrictions (CC&Rs).

Under section 5 of the CC&Rs and article 5, section 1 of the Association's bylaws, the directors had a duty to conduct the affairs of the Association, including the control and management of its property. The directors, not the members, had authority to alter the common areas. Although the members had the right to vote on any improvements that would cost more than $5,000, the directors had to authorize such improvements. The directors also had authority to investigate the lighting problem and propose solutions. Therefore, the residents of the project had to rely on the directors to provide sufficient lighting to protect them from criminal acts.

When an individual assumed a directorship of the Association, he or she accepted the duty to protect the residents of the project. Performance of that duty was commenced when the directors undertook an investigation of the lighting problem.

Thus, the directors owed a duty directly to plaintiff to protect her from the foreseeable criminal acts of others by providing the project with adequate lighting. Plaintiff alleges that the directors breached that duty by failing to act expeditiously despite their awareness of the lighting's inadequacy and the connection between inadequate lighting and criminal acts.

---

[5]The court in *Johnson*, unlike the Restatement Second of Agency, section 354, did not make allegation of physical harm a prerequisite to the liability of a director for torts committed against third parties. Since plaintiff here alleges physical harm, I would not reach the question whether the physical harm requirement can be reconciled with modern tort principles.

[6]The court in *Johnson* held that although plaintiff had not made the requisite allegations under the test the court devised, plaintiff could cure the defects in his complaint by amendment. (*Id.,* at p. 587.)

Plaintiff contends that the directors commenced an investigation but negligently failed to carry it forward. This failure to complete the investigation constitutes active participation in the Association's negligence. The directors may be able to establish the affirmative defense of reasonable reliance on the committee charged with investigating the lighting problem. However, this argument is dependent upon factual questions that cannot be resolved at the demurrer stage.

In sum, the Association functioned as a landlord and, therefore, owed a duty to the residents of the project to protect them from the foreseeable criminal acts of others. Plaintiff alleges that this duty was delegated to the directors of the Association as part of the responsibilities of their office. That delegation of the Association's duty to protect the project's residents created a special relationship between the directors and the residents. As a result of this special relationship, the directors, like the Association, owed an affirmative duty to plaintiff to protect her from foreseeable criminal acts. Given the directors' failure to act, despite their knowledge of the danger, plaintiff has sufficiently alleged a breach of that duty.

I agree with the majority's conclusion that the trial court's judgment must be reversed and plaintiff must be permitted to proceed with her negligence cause of action against the directors as well as the Association.

**MOSK, J.**, Concurring and Dissenting.—I concur in the judgment insofar as it affirms the judgment of the trial court dismissing plaintiff's causes of action for breach of contract and breach of fiduciary duty. I dissent, however, from the judgment insofar as it reverses the judgment of the trial court dismissing plaintiff's negligence cause of action.

Once again the majority make condominium ownership—which, as they themselves impliedly recognize, is a preferred form of home ownership available to many Californians—much more difficult and risky than it reasonably need be. In *Griffin Development Co.* v. *City of Oxnard* (1985) 39 Cal.3d 256 [217 Cal.Rptr. 1, 703 P.2d 339], they approved a local ordinance that made conversion of rental apartments to condominiums a practical impossibility in an entire city. Now, contrary to the common law principles applicable here, they impose on a voluntary nonprofit association of condominium owners the affirmative duty to protect the individual unit owner against the criminal acts of third parties committed outside common areas and within that person's own unit, and thereby expose the association to unwarranted and potentially substantial civil liability. Worse still, contrary to statutory law, they impose a similar duty on, and expose to similar liability, the individual unit owners who serve as the association's directors.

Plaintiff's negligence cause of action presents two related questions: (1) Under the facts alleged in the complaint, may the Village Green Owners Association (the Association) be held liable to plaintiff for injury resulting from the criminal acts of a third party? (2) May the individual members of its board of directors (the directors) be held liable? As I shall explain, the answer to each question should be no.

Even though understandable sympathy is aroused for this plaintiff, the analysis employed by the majority does not withstand close scrutiny.

On the question of the Association's potential liability, the analysis is unpersuasive because the claimed similarity between the relationship of condominium association to unit owner and that of landlord and tenant is not adequately probed. This is a crucial weakness since the potential liability of the Association to plaintiff is premised on the alleged similarity of these two relationships. Specifically, the majority's reliance on *O'Connor* v. *Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427], *Kwaitowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494], and *O'Hara* v. *Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798 [142 Cal.Rptr. 487], is ill founded.

*O'Connor,* on which the majority rely in holding condominium associations relevantly similar to landlords, has been subjected to strong criticism on its own terms. (Note, *Condominium Age-Restrictive Covenants Under the Unruh Civil Rights Act: O'Connor v. Village Green Owners Association* (1984) 18 U.S.F. L.Rev. 371; see Barnett, *The Supreme Court of California, 1981-1982: Foreword: The Emerging Court* (1983) 71 Cal.L.Rev. 1134, 1143-1146.) In any event it is plainly inapposite: whether a condominium association is similar to a landlord for the purposes of an antidiscrimination statute that covers "'all business establishments of every kind whatsoever'" (*O'Connor, supra,* 33 Cal.3d at pp. 793-794) is irrelevant to the issue whether such an association is similar to a landlord for the purposes of the general common law of torts. *Kwaitowski* and *O'Hara,* which discuss the basis and scope of the landlord's potential liability, constitute too slender a reed to support the majority's extension of such potential liability to a condominium association.

On the question of the directors' potential liability, a major weakness appears: Corporations Code section 7231, as I shall show, is misconstrued.

Contrary to the majority's implied holding, the Association is not under a duty to protect unit owners against the criminal acts of third parties that result from its nonfeasance, or failure to act: such a duty arises generally

from a "special relationship," and the condominium association-unit owner is not such a relationship.

It is well settled that a private person has no duty to protect another against the criminal acts of third parties absent a special relationship between the person on whom the duty is sought to be imposed and either the victim or the criminal actor. (E.g., *Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; *Kline* v. *1500 Massachusetts Avenue Apartment Corp.* (1970) 141 App.D.C. 370 [439 F.2d 477, 481]; *Reynolds* v. *Nichols* (1976) 276 Ore. 597, 600 [556 P.2d 102, 104]; *Cornpropst* v. *Sloan* (Tenn. 1975) 528 S.W.2d 188, 191 [93 A.L.R.3d 979]; Rest.2d Torts (1965) § 315; Prosser & Keeton, The Law of Torts (5th ed. 1984) § 56 at p. 385 [hereafter Prosser & Keeton]; Schoshinski, American Law of Landlord and Tenant (1980) § 4:14 at p. 216 [hereafter Schoshinski]; Haines, *Landlords or Tenants: Who Bears the Costs of Crime?* (1981) 2 Cardozo L.Rev. 299, 306 [hereafter Haines]; Note, *Landlord's Duty to Protect Tenants from Criminal Acts of Third Parties: The View from 1500 Massachusetts Avenue* (1971) 59 Geo. L.J. 1153, 1161 [hereafter *Landlord's Duty*]; Harper & Kime, *The Duty to Control the Conduct of Another* (1934) 43 Yale L.J. 886, 887; Annot., (1972) 43 A.L.R.3d 331, 339.)

As a result, the traditional rule has been that the landlord is not subject to a duty "to protect the tenant from criminal acts of third parties absent a contract or a statute imposing the duty." (Schoshinski, *supra,* § 4:14 at p. 216; accord, *Kwaitowski, supra,* 123 Cal.App.3d at p. 326; *O'Hara, supra,* 75 Cal.App.3d at p. 802; *Totten* v. *More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538, 543 [134 Cal.Rptr. 29]; see, e.g., *Pippin* v. *Chicago Housing Authority* (1979) 78 Ill.2d 204, 208 [399 N.Ed.2d 596, 598]; *Scott* v. *Watson* (1976) 278 Md. 160, 166 [359 A.2d 548, 552]; *Goldberg* v. *Housing Auth. of Newark* (1962) 38 N.J. 578, 583-588 [186 A.2d 291, 293-296, 10 A.L.R.3d 595].)

Since the landmark case of *Kline* v. *1500 Massachusetts Avenue Apartment Corp.,* however, the rule has been undermined (see, e.g., Prosser & Keeton, *supra,* § 63 at p. 442; Schoshinski, *supra,* § 4:15; Haines, *supra,* 2 Cardozo L.Rev. at pp. 314-322), and today several jurisdictions impose a limited duty on landlords to protect their tenants against the criminal acts of third parties. (See, e.g., *Kwaitowski, supra,* 123 Cal.App.3d at pp. 327-333; *Kline, supra,* 439 F.2d at pp. 480-485; *Samson* v. *Saginaw Professional Building, Inc.* (1975) 393 Mich. 393 [224 N.W.2d 843, 847-850]; *Trentacost* v. *Brussel* (1980) 82 N.J. 214, 220-223 [412 A.2d 436, 439-445]; see generally Schoshinski, *supra,* § 4:15, pp. 217-223 & 1985 Supp. at pp. 67-70, citing and discussing cases; see also Rest.2d Property (1976) § 17.3,

com. *l* & Rptr.'s note 13 [landlord has a duty to use reasonable care to protect tenants from the criminal acts of third parties arising in or from parts of leased property, retained in landlord's control, that tenant is entitled to use].)

Nevertheless, the emerging view that landlords may be under a limited duty to protect their tenants against the criminal acts of third parties—on which the majority here rely—does not appear to support excepting the Association from the traditional common law "no duty" rule: the five basic theories that support the landlord-tenant exception are largely inapplicable to the condominium association-unit owner relationship.

First, landlords have been subjected to a duty to protect on the theory that when, for consideration, a landlord undertakes to provide protection against the known hazard of criminal activity, he assumes a duty to protect. (See *Sherman* v. *Concourse Realty Corporation* (1975) 47 App.Div.2d 134, 139 [365 N.Y.S.2d 239, 243]; *Pippin, supra,* 78 Ill.2d at p. 209 [399 N.E.2d at p. 599].) Condominium associations, however, do not generally enter into such undertakings, and indeed the Association here is not alleged to have done so.

Second, landlords have been subjected to a duty to protect on the theory that the lease impliedly guarantees such protection: "the value of the lease to the modern apartment dweller is that it gives him 'a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, *secure windows and doors,* proper sanitation, and proper maintenance.'" (*Kline, supra,* 439 F.2d at p. 481, italics in original; accord, *Kwaitowski, supra,* 123 Cal.App.3d at p. 333 [implied warranty of habitability]; *Trentacost, supra,* 82 N.J. at pp. 225-228 [412 A.2d at pp. 441-443] [same].) There is no lease, of course, between condominium association and unit owner. Nor apparently do the unit owner and the condominium association—between whom no consideration passes—impliedly agree on such a package of goods and services. No such agreement, moreover, is alleged here.

Third, landlords have been subjected to a duty to protect on the theory that the landlord-tenant relationship is similar to the special relationship of innkeeper and guest. (See *Kwaitowski, supra,* 123 Cal.App.3d at pp. 327-333; *Kline, supra,* 439 F.2d at pp. 482-483; see also *O'Hara, supra,* 75 Cal.App.3d at p. 802 [impliedly following *Kline*].) "In [special] relationships the plaintiff is typically in some respect particularly vulnerable and dependent upon the defendant who, correspondingly, holds considerable power over the plaintiff's welfare. In addition, such relations have often

involved some existing or potential economic advantage to the defendant." (Prosser & Keeton, *supra,* § 56 at p. 374, fn. omitted.) Whatever the force of the analogy in the landlord-tenant context, it fails when applied to the condominium association-unit owner relationship. First, although the unit owner is dependent on the association for the general management of the complex, he is nevertheless a member of the association and can participate in its activities. Indeed, in the case at bar, as the allegations of the complaint show, plaintiff participated quite actively and successfully. Second, the condominium association-unit owner relationship involves no existing or potential economic advantage to the association. To be sure, no such advantage is alleged here.

Fourth, landlords have been subjected to a duty to protect on the theory that "traditional tort principles . . . [impose on] the landlord . . . a duty to exercise reasonable care for the tenant's safety in common areas under his control . . . ." (Haines, *supra,* 2 Cardoza L.Rev. at p. 333; accord, *Scott, supra,* 278 Md. at pp. 166-167 [359 A.2d at pp. 552-554].) Because the similarity of the landlord-tenant and condominium association-unit owner relationships is the issue here in question, to conclude that the condominium association should be subjected to such a duty under traditional tort principles governing the landlord-tenant relationship is, in effect, to beg the question. In any event, the existence of such a limited duty would be immaterial on the facts pleaded in the complaint: the criminal acts plaintiff alleges she suffered were committed not in common areas subject to the Association's control, but within her own unit.

Finally, landlords have been subjected to a duty to protect on the theory that the criminal activity in question was foreseeable. (See, e.g., *Kwaitowski, supra,* 123 Cal.App.3d at pp. 328-333; *Braitman* v. *Overlook Terrace Corp.* (1975) 68 N.J. 368, 375-383 [346 A.2d 76, 79-84].) It is not at all clear, however, that the criminal activity alleged here falls within even the broad definition of foreseeability articulated in *Kwaitowski,* i.e., knowledge on the part of the defendant of prior criminal activity of the same general type in the same general area (*id.,* at pp. 328-333). Rather, the criminal acts plaintiff alleges she suffered were rape and robbery; the prior criminal activity she alleges defendants had knowledge of included such offenses as automobile theft, purse snatching, and burglary.

In any event, foreseeability as the basis of the landlord's duty is problematic. "[I]t is generally understood that foreseeability alone does not justify the imposition of a duty . . . ." (Haines, *supra,* 2 Cardozo L.Rev. at p. 339; accord, Comment, *The Landlord's Emerging Responsibility for Tenant Security* (1971) 71 Colum.L.Rev. 275, 277; *Goldberg, supra,* 38 N.J. at p. 583 [186 A.2d at p. 293]; *Trice* v. *Chicago Housing Authority*

(1973) 14 Ill.App.3d 97, 100 [302 N.E.2d 207, 209].) "[R]ather [foreseeability] defines and limits the scope of *a pre-existent duty* that is based on the relationship of the parties." (*Landlord's Duty, supra,* 59 Geo. L.J. at p. 1178, italics added.) Hence, to reason from the foreseeability of harm to the existence of a duty to prevent such harm again begs the question. It follows that if foreseeability cannot support the imposition of a duty on landlords, it cannot support the imposition of a duty on condominium associations.

Thus, insofar as the criminal acts of third parties in this case are alleged to result from the Association's nonfeasance—in the majority's words, the failure "to complete the investigation of lighting alternatives[,] . . . to present proposals regarding lighting alternatives to members of the Association, . . . [and] to respond to the requests for additional lighting"—they are not within the scope of any duty that the Association may have owed to plaintiff.

It is at least arguable that the Association may be under a duty to protect unit owners against the criminal acts of third parties that result from its misfeasance. (Cf. Haines, *supra,* 2 Cardozo L.Rev. at p. 311, fn. 55 ["Despite the general 'no duty' rule, a landlord at common law was nevertheless liable for third party criminal acts against his tenants if his direct act of negligence precipitated the injury"].) Nevertheless, the Association is not under such a duty on the facts pleaded in the complaint: the allegations fail effectively to state that the Association's request that plaintiff remove the additional lighting she had installed—the only conduct alleged that rises above the level of nonfeasance—constituted misfeasance, or active misconduct.

"Misfeasance" evidently denotes conduct that is blameworthy in itself, apart from its alleged causal connection to the plaintiff's injury. (See, e.g., *Gidwani* v. *Wasserman* (1977) 373 Mass. 162, 166-167 [365 N.E.2d 827, 830-831] [landlord liable for loss arising from burglary after he disconnected tenant's burglar alarm during an unlawful entry to repossess premises for nonpayment of rent]; *De Lorena* v. *Slud* (N.Y. City Ct. 1949) 95 N.Y.S.2d 163, 164-165 [landlord liable for loss of property stolen by person who had obtained the key to the premises from landlord without tenant's authorization].) The misconduct alleged here does not rise to such a level of blameworthiness—especially in view of plaintiff's implied concession that the Association made the request on the ground that she had installed the additional lighting in violation of the declaration of covenants, conditions and restrictions (CC&R's).

Again contrary to the majority's implied holding, the directors are not under a duty to protect unit owners against the criminal acts of third parties

that result from their nonfeasance or from such "misfeasance" as is alleged here.

Assuming for argument's sake that the majority are correct in concluding that the potential liability of the directors is governed by the general common law of torts, the directors are not under a duty to protect: just as the relationship between the Association and the unit owner does not give rise to such a duty, neither does that between the directors as the Association's agents and the unit owner.

But as for all directors, the potential liability of the directors here—which is created by the duty imposed on them and the standard of care to which they are held—is governed not by the common law but rather by statute. (See Corp. Code, § 300 & Assem. Select Com. Rep. on Revision of Corp. Code (1975) pp. 41-43 [hereafter Assem. Select Com. Rep.] [duty under General Corporation Law, which is the source of Nonprofit Corporation Law], § 7210 [same under Nonprofit Mutual Benefit Corporation Law], § 309 [standard of care under General Corporation Law], § 7231 [same under Nonprofit Mutual Benefit Corporation Law].)

The duty of the directors here, who direct a nonprofit mutual benefit corporation, is established in Corporations Code section 7231. Although the statute fails to describe the duty with specificity or to tell directors precisely what they must do (cf. Calfas, *Boards of Directors: A New Standard of Care* (1976) 9 Loyola L.A. L.Rev. 820, 821 [discussing the General Corporation Law, which is similar to the Nonprofit Corporation Law] [hereafter Calfas]), it does nevertheless set forth the substance of the directors' obligation: to pursue the interests of the corporation before even their own (see Corp. Code, §§ 7231, 7233, 7235-7237).

Under the statute the directors apparently owe a duty to the corporation alone. (See Corp. Code, § 300 & Assem. Select Com. Rep., *supra,* at pp. 41-43 [General Corporation Law], § 7210 [Nonprofit Mutual Benefit Corporation Law].) Assuming, however, that a duty toward third parties derives from the duty toward the corporation, it must then be determined whether such a derivative duty is broad enough to embrace, on the facts alleged here, a duty to protect unit owners against the criminal acts of third parties. I do not believe that it is: the common law, as I have shown, imposes no such duty; and since the statute has as one of its purposes the *limitation* of directors' potential liability (cf. Note, *California's New General Corporation Law: Directors' Liability to Corporations* (1976) 7 Pacific L.J. 613, 613 [discussing Corp. Code, § 309] [hereafter *Directors' Liability*]), it should not be construed to impose such a duty.

I shall assume for argument's sake, however, that the directors' duty is in fact broad enough. But since in neither specific nor conclusory terms does plaintiff allege that the directors have failed to satisfy the standard of care to which the statute subjects them, they cannot be held personally liable.

Section 7231, subdivision (a), provides in relevant part that "[a] director shall perform the duties of a director . . . in good faith, in a manner such director believes to be in the best interests of the corporation and with such care . . . as an ordinarily prudent person in a like position would use under similar circumstances." Subdivision (b) provides that the director is entitled to rely on information, opinions, and reports presented by certain specified persons. Finally, subdivision (c) provides in relevant part that "[a] person who performs the duties of a director in accordance with subdivisions (a) and (b) *shall have no liability based upon any alleged failure to discharge the person's obligations as a director . . . .*" (Italics added.)

In other words, section 7231 declares that a director may not be held personally liable for acts or omissions as a director unless he breaches the duty imposed by the statute. As the Report of the Assembly Select Committee on the Revision of the Corporations Code states in discussing Corporations Code section 309, subdivision (c), which is the source and counterpart of section 7231, subdivision (c): "a person [is relieved] from any liability by reason of being or having been a director of a corporation, if that person has exercised his duties in the manner contemplated by this section." (Assem. Select Com. Rep., *supra,* at p. 54.) Thus, "[i]t is clearly intended that the standard set forth is exclusive . . . ." (*Directors' Liability, supra,* 7 Pacific L.J. at p. 615.)

Section 7231, in effect, imposes on directors a standard of care that is different from, and indeed somewhat lower than, that which the common law of torts imposes generally—specifically, a standard of care that is in significant aspect one of subjective reasonableness. (Cf. 1 Marsh, Cal. Corporation Law (2d ed. 1981) § 10.3 at pp. 572-576 [discussing Corp. Code, § 309].) Such a lower standard is consistent with what almost all courts have actually demanded of directors. (See Calfas, *supra,* 9 Loyola L.A. L.Rev. at pp. 829-830; Bishop, *New Problems in Indemnifying and Insuring Directors: Protection Against Liability Under the Federal Securities Laws,* 1972 Duke L.J. 1153, 1154; Bishop, *Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers* (1968) 77 Yale L.J. 1078, 1095-1101.)

Section 7231 imposes the same standard that section 309 of the General Corporation Law imposes on directors of commercial corporations. "This

general standard has three elements: a director must perform duties as a director (1) in good faith, (2) in a manner the director believes is in the best interests of the corporation, and (3) with such care . . . as an ordinarily prudent person in a like position would use under similar circumstances." (1B Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1985) § 406.01[1] at p. 19-192 [hereafter Ballantine & Sterling].) This standard was based on the then proposed revision of section 35 of the Model Business Corporation Act (hereafter Model Act) (ABA, *Rep. of Com. on Corporate Laws: Changes in the Model Business Corporation Act* (1974) 29 Bus. Law. 947 [hereafter ABA Com. Rep.]), which was drafted by the Committee on Corporate Laws of the American Bar Association (hereafter the ABA Committee). (1B Ballantine & Sterling, *supra,* § 406.01[1] at p. 19-192; Stern, *The General Standard of Care Imposed on Directors Under the New California General Corporation Law* (1976) 23 UCLA L.Rev. 1269, 1275 [hereafter Stern].)

That the standard of care imposed by section 7231 is in significant aspect one of subjective reasonableness appears from a consideration of the underlying intention of the statute. The purpose of Model Act section 35—the ultimate source of section 7231—was that "a director should not be liable for an *honest* mistake of business judgment." (ABA Com. Rep., *supra,* 29 Bus. Law. at p. 951, italics added.) The purpose of Corporations Code section 309, which defines the statutory standard of care for directors of commercial corporations and is the immediate source of section 7231, is the same. (Assem. Select Com. Rep., *supra,* at p. 48.) Thus, it is clear that "the drafters of the Nonprofit Corporation Law intended that the standard as imported into [the General Corporation Law] should have the same result." (1B Ballantine & Sterling, *supra,* § 406.01[1] at pp. 19-192—19-193.)

That the standard of care imposed by section 7231 is one of subjective reasonableness appears also from an analysis of its three elements.

First, "good faith"—which is "[o]ne of the most basic elements of the general standard"—"is inherently largely subjective . . . ." (1B Ballantine & Sterling, *supra,* § 406.01(1) at p. 19-193.)

Second, "[t]he requirement that a director believe his or her action or inaction is in the best interests of the corporation is also subjective, since the requirement relates to the director's actual belief rather than what the director ought to have believed or what a reasonable person might have believed under comparable circumstances." (*Id.,* at p. 19-194.) The subjective character of this requirement becomes all the more evident when we compare section 7231 to Model Act section 35 as it was approved by the

ABA Committee. The latter provides in relevant part that a director shall perform his duties "in a manner he *reasonably* believes to be in the best interests of the corporation . . . ." (ABA, *Rep. of Com. on Corporate Laws: Changes in the Model Business Corporation Act* (1974) 30 Bus. Law. 501, 502, italics added.) Corporations Code section 309 adopted the requirement as articulated in section 35, but with the prominent omission of the word "reasonably." Although the drafters do not explain the omission (Stern, *supra,* 23 UCLA L.Rev. at p. 1278), it seems fair to infer that they consciously intended the requirement to be subjective.

Finally, the requirement that the director use the degree of skill and attention that an ordinarily prudent person in a similar position would use under similar circumstances does not transform the standard of care imposed by section 7231 into one of objective reasonableness.

First, the phrase "ordinarily prudent person" was evidently intended not to introduce the generally applicable common law standard of the reasonably prudent man, but simply to preclude the imposition in certain cases of a duty to use expertise. Quoting from the ABA Committee Report (29 Bus. Law. at p. 954) with approval, the Assembly Select Committee Report states: "'[T]he reference to "ordinarily prudent person" emphasizes long traditions of the common law, *in contrast to standards that might call for some undefined degree of expertise, like "ordinarily prudent businessman"* . . . .'" (Assem. Select Com. Rep., *supra,* at p. 49, italics added.)

Second, the phrase "under similar circumstances" does not suggest that the statutory standard of care is reducible to objective reasonableness. The point is established by what the Assembly Select Committee Report chooses to say and by what it chooses not to say about the phrase.

The Assembly Select Committee Report quotes approvingly from the ABA Committee Report (29 Bus. Law. at p. 954) as follows: "'The phrase . . . is intended both to recognize that the nature and extent of oversight will vary [depending on the circumstances] . . . and to limit the critical assessment of a director's performance to the time of action or nonaction and thus prevent the harsher judgments which can invariably be made with the benefit of hindsight . . . .'" (Assem. Select Com. Rep., *supra,* at p. 49.)

The Assembly Select Committee Report, however, *omits* quoting the following portion of the ABA Committee Report: "The phrase also gives recognition to the fact that the special background and qualifications a particular director may possess, as well as his other responsibilities (or their absence) in the management of the business and affairs of the corporation, may place a measure of responsibility upon such director in passing on a

particular problem which may differ from that placed upon another director . . . ." (ABA Com. Rep., *supra,* 29 Bus. Law. at p. 954.) "This omission was intentional. . . . The mere fact that a director is a lawyer, a person with accounting training or an investment banker, should not impose upon that director in the performance of his ordinary directorial functions a greater duty of care than that which is imposed upon directors generally." (Stern, *supra,* 23 UCLA L.Rev. at p. 1277, fn. omitted.) By this intentional omission the drafters plainly imply that the standard of care imposed by section 7231 is different from, and indeed somewhat lower than, the generally applicable objective standard of the common law: under the common law, "if a person in fact has knowledge, skill, or even intelligence superior to that of the ordinary person, the law will demand of that person conduct consistent with it." (Prosser & Keeton, *supra,* § 32 at p. 185.)

The somewhat lower standard of care imposed by section 7231 is intended to limit the director's exposure to liability and thereby encourage qualified persons to assume and remain in directorship positions. (See *Directors' Liability, supra,* 7 Pacific L.J. at p. 613.) Such encouragement appears particularly needed in the context of condominium associations, in which unit owners seem generally disinclined to serve as directors. (See Hanna, Cal. Condominium Handbook (1975) § 138 at p. 115.)

Plaintiff does not allege that the directors have failed to satisfy the statutory standard of care in fulfilling any duty they may have owed her. Indeed, with regard to the request that plaintiff remove the additional lighting she had installed, the allegations suggest quite the opposite—viz., that the directors were actually fulfilling their duty: they were obligated to enforce the provisions of the CC&R's, and the additional lighting had evidently been installed in violation of such provisions.

The effect of section 7231 cannot be avoided by asserting, as the majority do, that whereas the directors' duty to the corporation and the applicable standard of care is governed by the statute, their duty to third parties and the standard of care applicable to that duty is governed by the general common law. First, as I have explained, the statute establishes the potential liability of directors *qua directors.* Second, the language of section 7231, subdivision (c), which is quoted above, by its very terms precludes liability apart from the statute. Third, the provision was plainly intended to have such an effect: "[t]he purpose of [subdivision (c)] is to relieve a person from any liability by reason of being or having been a director of a corporation, if that person has exercised his duties in the manner contemplated by this section." (Assem. Select Com. Rep., *supra,* at p. 54 [commenting on Corp. Code, § 309, subd. (c)].) Finally, the purpose of the provisions— to lower the standard of care somewhat in order to encourage qualified

persons to assume and remain in directorship positions—would otherwise be frustrated. In practically every act or omission, directors necessarily affect both the corporation and third parties. To hold directors to a higher standard of care insofar as their acts or omissions affect third parties and to a lower standard insofar as they affect the corporation is, in effect, to hold them to the higher standard: they will not be free from liability unless they adhere to the higher standard.

But even if the statute were intended only to govern the potential liability of directors toward the corporation and hence did not directly govern their potential liability toward third parties, I would nevertheless conclude that under no circumstances should they be held to a standard of care higher than that established by the statute. The reason for this is plain: if directors were held to the somewhat higher common law standard, the purpose of section 7231, as I have shown, would manifestly be frustrated. To avoid such a result, I would hold that the common law standard was effectively modified in this respect.[1]

Because neither the Association nor the directors are potentially liable under applicable law, I would affirm the judgment in its entirety.

Lucas, J., concurred.

---

[1]Against my conclusion that the statutory standard of care applies to the director's duty to third parties as well as to his duty to the corporation, the majority make two arguments, neither of which has merit. The first is that the cases and treatises are to the contrary. They are not: none of the authorities cited by the majority considers statutory language or express legislative policy similar to ours—to the effect that a director is not subject to liability if he acts in good faith—and hence none is apposite.

The majority's second argument runs in substance as follows: section 7237, subdivision (c), which authorizes indemnification in third party actions, implies that a director can be held liable even if he acts in good faith, and thereby necessarily suggests that the standard of care applicable to the director's exercise of his duty to third parties is the general common law standard of reasonableness. But even assuming for argument's sake that the majority's premise is supported, the conclusion they draw is unsound. It is simply unreasonable to read the provision as impliedly contradicting the very words of section 7231, subdivision (c), and the underlying express legislative policy. Rather, the provision should be read as the Legislature's authorization of indemnification for directors of California corporations against the costs of liability in jurisdictions—unlike California—that hold them to the general common law standard of care.